# THE PEOPLE OF THE STATE OF ILLINOIS, *ex rel.* MICHAEL O'CONNELL

*v.*

# ROBERT TURNER, Superintendent of the Reform School of the City of Chicago.

1. PERSONAL LIBERTY OF CHILDREN—*of their care and custody—relative rights of the parent and the State—imprisonment without crime—"reform school" of Chicago.* The parent has the natural right to the care and custody of his child, and this right should not be abridged by the State, except from a necessity arising from gross misconduct or almost total unfitness on the part of the parent.

2. The State has no power to imprison a child, who has committed no crime, on the mere allegation that he is "destitute of proper parental care, and is growing up in mendicancy, ignorance, idleness and vice."

3. The acts of 1863 and 1867, in reference to the "reform school" of the city of Chicago, purport to authorize the commitment to such "reform school," of children between the ages of six and sixteen years, "who are destitute of proper parental care, and growing up in mendicancy, ignorance, idleness or vice," but who may have committed no crime, to be there "kept, disciplined, instructed, employed and governed," until they shall be reformed and discharged, or shall have arrived at the age of twenty-one years; and the sole authority to discharge is attempted to be given to a board of guardians. Under these laws, a boy, between fourteen and fifteen years of age, was committed to the "reform school," without having been convicted or charged with any crime, and on application of the father of the boy for a writ of *habeas corpus*, on the allegation that the latter was illegally restrained of his liberty: *Held*, the laws under which he was so imprisoned were in violation of the bill of rights embodied in the constitution, which declares the inherent and inalienable right of all men to their personal liberty, and were therefore void.

Application for a writ of *habeas corpus*.

The opinion of the court sets forth the ground of the application.

Messrs. NISSEN & BARNUM, Mr. M. F. HEENAN and Mr. WM. F. BUTLER, for the relator.

Mr. M. F. TULEY and Mr. I. N. STILES, for the respondent.

Mr. JUSTICE THORNTON delivered the opinion of the Court:

By the order of this court, the writ of *habeas corpus* was issued, commanding Robert Turner, superintendent of the reform school of the city of Chicago, to show cause for the caption and detention of Daniel O'Connell.

The petition of Michael O'Connell represents, that he is the father of Daniel, a boy between fourteen and fifteen years of age, and that he is restrained of his liberty contrary to the law, without conviction of crime, and under color of the following mittimus:

STATE OF ILLINOIS, ⎫ ss. ⎰ Superior Court of Cook county.
COOK COUNTY.     ⎭      ⎱ Of the Sept. Term, A. D. 1870.

*The People of the State of Illinois to the Superintendent of the Reform School of the city of Chicago:   Greeting:*

We do hereby command you, that you take the body of Daniel O'Connell, a boy above the age of six and under the age of sixteen years, who, upon due examination by the Hon. Wm. A. Porter, one of the judges of the Superior Court of Cook county, has been found, by competent evidence, to be a proper subject for commitment in the said reform school, and whose moral welfare and the good of society require that he should be sent to said school for instruction, employment and reformation, and that you confine the said Daniel O'Connell within the said reform school, according to the statute in such cases made and provided, and for so doing, this shall be your sufficient warrant.

To the sheriff of Cook county to execute.

Witness, Augustus Jacobson, clerk of our said Superior Court, and the seal thereof, this ninth day of September, A. D. 1870.                     A. JACOBSON, Clerk.

The return is, that the boy had been detained by authority of the mittimus, which accompanied the petition, the original

of which was filed with an endorsement thereon by the sheriff of its due execution, by the delivery of the " body of the prisoner to the superintendent of the reform school."

It is admitted, that the relator is the father of the boy, alleged to be restrained of his liberty, and that he is of the age stated.

The only question for determination, is the power of the legislature to pass the laws, under which this boy was arrested and confined.

The first act, in relation to this " reform school," is a part of the charter of the city of Chicago, approved February 13, 1863, and the second is entitled, " an act in reference to the reform school of the city of Chicago," approved March 5, 1867.

The first section establishes "a school for the safe keeping, education, employment and reformation of all children between the ages of six and sixteen years, who are destitute of proper parental care, and growing up in mendicancy, ignorance, idleness or vice."

Section four, of the act of 1867, provides, that " whenever any police magistrate, or justice of the peace, shall have brought before him any boy or girl, within the ages of six or sixteen years, who he has reason to believe is a vagrant, or is destitute of proper parental care, or is growing up in mendicancy, ignorance, idleness or vice," he shall cause such boy or girl to be arrested, and, together with the witnesses, taken before one of the judges of the superior or circuit court of Cook county. The judge is empowered to issue a summons, or order in writing, to the child's father, mother, guardian, or whosoever may have the care of the child, in the order named, and if there be none such, to any person, at his discretion, to appear, at a time and place mentioned, and show cause why the child should not be committed to the " reform school," and upon return of due service of the summons, an investigation shall be had. The section then directs, " if, upon such examination, such judge shall be of opinion that said boy or girl is a proper subject for commitment to the reform school, and that his or

her moral welfare, and the good of society, require that he or she should be sent to said school for employment, instruction and reformation, he shall so decide, and direct the clerk of the court of which he is judge, to make out a warrant of commitment to said reform school; and such child shall thereupon be committed."

Section nine, of the act of 1863, directs, that all persons between six and sixteen years of age, convicted of crime punishable by fine or imprisonment, who, in the opinion of the court, would be proper subjects for commitment, shall be committed to said school.

Section ten authorizes the confinement of the children, and that they " shall be kept, disciplined, instructed, employed and governed," until they shall be reformed and discharged, or shall have arrived at the age of twenty-one years; and that the sole authority to discharge shall be in the board of guardians.

The warrant of commitment does not indicate that the arrest was made for a criminal offense. Hence, we conclude that it was issued under the general grant of power, to arrest and confine for misfortune.

The contingencies enumerated, upon the happening of either of which the power may be exercised, are vagrancy, destitution of proper parental care, mendicancy, ignorance, idleness or vice. Upon proof of any one, the child is deprived of home, and parents, and friends, and confined for more than half of an ordinary life. . It is claimed, that the law is administered for the moral welfare and intellectual improvement of the minor, and the good of society. From the record before us, we know nothing of the management. We are only informed that a father desires the custody of his child; and that he is restrained of his liberty. Therefore, we can only look at the language of the law, and the power granted.

What is proper parental care? The best and kindest parents would differ, in the attempt to solve the question. No two scarcely agree; and when we consider the watchful supervision, which is so unremitting over the domestic affairs of others,

the conclusion is forced upon us, that there is not a child in the land who could not be proved, by two or more witnesses, to be in this sad condition. Ignorance, idleness, vice, are relative terms. Ignorance is always preferable to error, but, at most, is only venial. It may be general or it may be limited. Though it is sometimes said, that "idleness is the parent of vice," yet the former may exist without the latter. It is strictly an abstinence from labor or employment.. If the child perform all its duties to parents and to society, the State has no right to compel it to labor. Vice is a very comprehensive term. Acts, wholly innocent in the estimation of many good men, would, according to the code of ethics of others, show fearful depravity. What is the standard to be? What extent of enlightenment, what amount of industry, what degree of virtue, will save from the threatened imprisonment? In our solicitude to form youth for the duties of civil life, we should not forget the rights which inhere both in parents and children. The principle of the absorption of the child in, and its complete subjection to the despotism of, the State, is wholly inadmissible in the modern civilized world.

The parent has the right to the care, custody and assistance of his child. The duty to maintain and protect it, is a principle of natural law. He may even justify an assault and battery, in the defense of his children, and uphold them in their law suits. Thus the law recognizes the power of parental affection, and excuses acts which, in the absence of such a relation, would be punished. Another branch of parental duty, strongly inculcated by writers on natural law, is the education of children. To aid in the performance of these duties, and enforce obedience, parents have authority over them. The municipal law should not disturb this relation, except for the strongest reasons. The ease with which it may be disrupted under the laws in question; the slight evidence required, and the informal mode of procedure, make them conflict with the natural right of the parent. Before any abridgment of the right, gross misconduct or almost total unfitness on the part of the parent,

should be clearly proved. This power is an emanation from God, and every attempt to infringe upon it, except from dire necessity, should be resisted in all well governed States. "In this country, the hope of the child, in respect to its education and future advancement, is mainly dependent upon the father; for this he struggles and toils through life; the desire of its accomplishment operating as one of the most powerful incentives to industry and thrift. The violent abruption of this relation would not only tend to wither these motives to action, but necessarily, in time, alienate the father's natural affections."

But even the power of the parent must be exercised with moderation. He may use correction and restraint, but in a reasonable manner. He has the right to enforce only such discipline, as may be necessary to the discharge of his sacred trust; only moderate correction and temporary confinement. We are not governed by the twelve tables, which formed the Roman law. The fourth table gave fathers the power of life and death, and of sale, over their children. In this age and country, such provisions would be atrocious. If a father confined or imprisoned his child for one year, the majesty of the law would frown upon the unnatural act, and every tender mother and kind father would rise up in arms against such monstrous inhumanity.* Can the State, as *parens patriæ*, exceed the power of the natural parent, except in punishing crime?

These laws provide for the " safe keeping " of the child; they direct his " commitment," and only a " ticket of leave," or the uncontrolled discretion of a board of guardians, will permit the imprisoned boy to breathe the pure air of heaven outside his prison walls, and to feel the instincts of manhood by contact with the busy world. The mittimus terms him " a proper subject for commitment;" directs the superintendent to " take his body," and the sheriff endorses upon it, " executed by delivering the body of the within named prisoner." The

---

*See the case of *Fletcher et al.* v. *The People*, holding that the father may be indicted and punished for inhuman treatment of his child.

confinement may be from one to fifteen years, according to the age of the child. Executive clemency can not open the prison doors, for no offense has been committed. The writ of *habeas corpus*, a writ for the security of liberty, can afford no relief, for the sovereign power of the State, as *parens patriæ*, has determined the imprisonment beyond recall. Such a restraint upon natural liberty is tyranny and oppression. If, without crime, without the conviction of any offense, the children of the State are to be thus confined for the " good of society," then society had better be reduced to its original elements, and free government acknowledged a failure.

In cases of writs of *habeas corpus* to bring up infants, there are other rights beside the rights of the father. If improperly or illegally restrained, it is our duty, *ex debito justitiæ*, to liberate. The welfare and rights of the child are also to be considered. The disability of minors does not make slaves or criminals of them. They are entitled to legal rights, and are under legal liabilities. An implied contract for necessaries is binding on them. The only act which they are under a legal incapacity to perform, is the appointment of an attorney. All their other acts are merely voidable or confirmable. They are liable for torts, and punishable for crime. Lord Kenyon said, " If an infant commit an assault, or utter slander, God forbid that he should not be answerable for it, in a court of justice." Every child over ten years of age may be found guilty of crime. For robbery, burglary or arson, any minor may be sent to the penitentiary. Minors are bound to pay taxes for the support of the government, and constitute a part of the militia, and are compelled to endure the hardship and privation of a soldier's life, in defense of the constitution and the laws; and yet it is assumed, that to them, liberty is a mere chimera. It is something of which they may have dreamed, but have never enjoyed the fruition.

Can we hold children responsible for crime; liable for their torts; impose onerous burdens upon them, and yet deprive them of the enjoyment of liberty, without charge or conviction

of crime? The bill of rights declares, that "all men are, by nature, free and independent, and have certain inherent and inalienable rights—among these are life, liberty, and the pursuit of happiness." This language is not restrictive; it is broad and comprehensive, and declares a grand truth, that "all men," all people, everywhere, have the inherent and inalienable right to liberty. Shall we say to the children of the State, you shall not enjoy this right—a right independent of all human laws and regulations? It is declared in the constitution; is higher than constitution and law, and should be held forever sacred.

Even criminals can not be convicted and imprisoned without due process of law—without a regular trial, according to the course of the common law. Why should minors be imprisoned for misfortune? Destitution of proper parental care, ignorance, idleness and vice, are misfortunes, not crimes. In all criminal prosecutions against minors, for grave and heinous offenses, they have the right to demand the nature and cause of the accusation, and a speedy public trial by an impartial jury. All this must precede the final commitment to prison. Why should children, only guilty of misfortune, be deprived of liberty without "due process of law?"

It can not be said, that in this case, there is no imprisonment. This boy is deprived of a father's care; bereft of home influences; has no freedom of action; is committed for an uncertain time; is branded as a prisoner; made subject to the will of others, and thus feels that he is a slave. Nothing could more contribute to paralyze the youthful energies, crush all noble aspirations, and unfit him for the duties of manhood. Other means of a milder character; other influences of a more kindly nature; other laws less in restraint of liberty, would better accomplish the reformation of the depraved, and infringe less upon inalienable rights.

It is a grave responsibility to pronounce upon the acts of the legislative department. It is, however, the solemn duty of the courts to adjudge the law, and guard, when assailed, the

liberty of the citizen. The constitution is the highest law; it commands and protects all. Its declaration of rights is an express limitation of legislative power, and as the laws under which the detention is had, are in conflict with its provisions, we must so declare.

It is therefore ordered, that Daniel O'Connell be discharged from custody.

*Discharged.*