536 P.2d 1062

In the Matter of the ADOPTION OF
Michael Gregory HYATT, a minor.
Richard A. HYATT, Sr., and Roberta B.
Hyatt, Appellants,

v.

Richard A. HYATT, Jr., and Rosemary A.
Hyatt, Appellees.

No. 2 CA–CIV 1738.

Court of Appeals of Arizona,
Division 2.

June 23, 1975.

Rehearing Denied Aug. 8, 1975.

Review Denied Oct. 14, 1975.

Polley & Polley by Alan K. Polley, Sierra Vista, for appellants.

Robert Morrison, Sierra Vista, for appellees.

## OPINION

HOWARD, Chief Judge.

Richard Hyatt, Sr. and Roberta Hyatt are husband and wife and the natural parents of Michael Hyatt, born July 18, 1968. Richard Hyatt, Jr. and Rosemary Hyatt, husband and wife, are the proposed adopting parties. Richard Hyatt, Jr. is a Major in the Army stationed at Fort Huachuca, Arizona, and resides in Sierra Vista, Arizona. He is the son of Richard Hyatt, Sr. and Roberta B. Hyatt is his step-mother. The trial court found: "That neither of the Objectors, the natural parents of MICHAEL GREGORY HYATT, are capable of properly promoting the care, welfare and the best interests of said minor child." It granted the petition of the Hyatts Jr. to adopt Michael Gregory Hyatt. For rea-

sons which hereinafter appear we hold that the trial court abused its discretion in granting the adoption.

The Hyatts Sr. live in Medford Lakes, New Jersey. When Roberta Hyatt was a college student, she went to live at the residence of Hyatt Sr. who was then married to Roberta's aunt. In 1966, after the death of her aunt, Roberta married Hyatt Sr. At that time she was twenty-one and he was fifty-nine. For the first six months of Michael's life he was cared for by his natural parents without any untoward events. In February of 1969, when Michael was seven months old, Roberta had a serious mental breakdown. She was suffering from delusions and felt that her mother was molesting her child and that her husband was trying to hurt her and the child. She ran away from home with the child and ended up in a motel where she called her husband's brother. She was taken by the family to the Trenton State Hospital.

Hyatt Sr. gave Michael to the Hyatts Jr. who resided in Baltimore, Maryland and asked them to take care of him. Roberta Hyatt remained in the State Hospital for seven weeks. In September of 1969, she went to the residence of the Hyatts Jr. in Baltimore, stayed there for a week, and then returned to New Jersey with Michael. On December 23, 1969, Hyatt Sr. called Hyatt Jr., told him that Roberta could not take care of Michael and returned Michael to the residence of the Hyatts Jr. in Baltimore. Michael stayed in Baltimore until June, 1970 when Hyatt Sr. took him back to New Jersey.

The next time Hyatt Jr. saw Michael was January 3, 1971, when Hyatt Sr. again returned him to the Hyatts Jr. in Baltimore. During the month of February, 1971, Hyatt Sr. visited Michael several times in Baltimore. Roberta did not go to Baltimore until the day before the Hyatts Jr. left for Fort Huachuca. At that time they asked Hyatt Jr. to take Michael and care for him.

On Easter weekend in 1971, the Hyatts Sr. went to Sierra Vista, Arizona to visit Michael but did not ask to take him back to New Jersey. Roberta also went to visit Michael on his birthday in July of 1971 and stayed for a week. In September of 1971, Hyatt Sr. suffered a heart attack, followed by two strokes which left him paralyzed on the right side and unable to speak.

In March of 1972, Roberta called the Hyatts Jr. in Sierra Vista and asked them to return Michael. They refused to do so and on March 8 called and told her that they were going to a lawyer to see if they could get custody of Mike.

The Hyatts Sr. would not consent to the adoption and the trial of this case commenced on June 28, 1973. Testifying on behalf of the petitioners were Drew Hyatt Helgrin, Robert W. Hyatt, sister and brother respectively of Richard Hyatt, Sr.; Robert Hyatt's wife; the petitioners; a speech therapist and the adoption worker who investigated the suitability of petitioner's home environment.

Richard Hyatt, Jr. testified as to the home he would be able to provide Michael. In addition to Michael, four children were then living in the home of the Hyatts Jr.: Drew, age 16; Richard Hyatt, III, age 6; Frederick, age 2½; and Robert, an infant. There is no doubt that the Hyatts Jr. would be able to provide a good home for Michael and were well able to raise him.

Hyatt Jr. testified that when Michael went back to live with Hyatt Sr. in June of 1970, he was speaking several words although he was not using them in sentences. When Michael returned to the Hyatt Jr. family on January 3, 1971, Michael was not talking and would only say "yes" or "no". He appeared to be frightened and unaccustomed to the normal freedom of the Hyatt Jr. household. He further testified that in June of 1970 when Roberta visited them in Baltimore she was listless, showed no initiative, slept in and would do nothing to help with Michael unless asked.

He further recounted an incident that occurred in August of 1969 when his father and Roberta spent the day with them. Michael was in a wading pool and Roberta was sitting next to him when Mike fell face down in the pool. Roberta did nothing and he and his wife rushed out but in the meantime Michael had gotten up by himself from the water.

In response to questioning by his attorney, Richard Hyatt Jr. stated that he was willing to have his father and Roberta visit Michael; that he did not want to deprive them of the parental relationship with Mike; but wanted continuity of possession for the education and care of Michael.

Until March of 1972, the Hyatts Sr. were contributing to the support of Michael. After March, they continued to send support checks but the Hyatts Jr. refused to cash them.

Richard Hyatt Jr. testified that July of 1971 was the last time he saw Roberta. Also, that he talked to her on the phone about three weeks prior to trial and in his opinion she was about the same as when he saw her last in New Jersey or last spoke to her on the telephone.

Rosemary Hyatt testified that Michael had an articulation problem and had been consulting a speech therapist. According to her, in September of 1969, she had to explain to Roberta how to bathe Michael. She further testified that when Michael returned in January of 1971, he was nervous, frightened and had temper tantrums. She also corroborated her husband's testimony regarding the incident in the wading pool. Rosemary stated that they did not return Michael because, since Mr. Hyatt Sr.'s heart attack, Roberta had her hands full and Michael "was going back and forth like a ping-pong ball."

The speech therapist testified as to Michael's speech problems and said he needed continuing therapy. No one was able to give any reasons for Michael's speech problem.

Drew Hyatt Helgrin lives in Florida. She helped take Roberta to the Trenton State Hospital in February of 1969. She also testified that in January of 1971, Michael appeared frightened when he returned to the Hyatts Jr. in Baltimore. She visited her brother after his heart attack and again on January 26, 1973 and stated that Roberta did an excellent job of taking care of her brother. In 1970, her last visit to the Hyatt Sr. household at which time Michael was with his parents, she felt there was emotional stress. She opined that it is important for children to be raised by both parents and that since her brother's stroke he was not as emotionally stable as he had been. She thought this could affect Michael.

Drew Hyatt Helgrin further testified that in 1973 Roberta was taking care of her brother's needs, prepared meals, did housekeeping and helped her brother in and out of his wheelchair. She stated that her brother was then almost able to completely dress and take care of himself. Also, that the Hyatt Sr. home was in a nice residential area. Since November of 1971, she had seen no indication of impairment or abnormality on the part of Roberta and thought she was doing very well. Her major concern was that there be a decision regarding where the child was going to be, and that he not be shifted from one place to another.

She testified on cross-examination:

"Q. Was there a change in the ability of Bobby to handle situations and to act the part of a responsible person in November, December of '71 and then in January of '73 as opposed to the times that you had seen her in Florida at your home earlier?

A. Yes, definitely.

Q. And there was—what type of change? What way did the changing improve?

A. I think Bobby accepted the responsibility of caring for Dick. She felt very definitely needed, and she was coping with the situation. I questioned, when I was there in November, she spoke about driving to Arizona to get

Mike to bring him back for Christmas holidays, and I questioned whether she could cope with two situations at the same time.

Q. But you feel that her ability to at least cope with one situation, that of your brother's condition, had improved from November even to January of '73?

A. I don't think there was much difference in those two times. The difference was before she was under sedation."

Robert Hyatt is a gynecologist. Prior to Roberta's breakdown, he felt his brother gave much support to the care of the child, preparation of meals and running the household, and that Roberta was perhaps not as adept in homemaking and child rearing as some people he had known or observed. He stated:

"A. I think the best way I can put it is I am not against Roberta or Dick. I am for Michael. It's my very strong judgment that he is in the best situation in the home of my nephew, Richard, or Dick, Junior, and I just feel it would be a disaster if he went back to Medford."

Robert Hyatt testified that the Hyatt, Sr. home was being maintained in a better condition than when Michael was living there.

As to the period of time when Michael was with Roberta, just after she had left the hospital, he stated:

"A. This was while she was receiving psychiatric care, and I feel that she was having a difficult time. I don't know whether she was aware of it. I think this was part of the problem with her medication. Perhaps she was oblivious to a good bit of the events that were occurring, including her own child."

When asked by the objectors' attorney why he felt it would be disaster for Michael to live with his natural parents, he responded:

"A. I feel that he has, in essence, he does not have a father. I am sure there are plenty of widows who bring up children, but he does not have a father who

is affective [sic]. I don't believe that Roberta in my judgment has had the experience of motherhood and caring for children, despite the fact that she has taught elementary school, it's to me an entirely different thing then [sic] taking care of a child in a home, that she can affectively [sic] care for both Michael and her husband at this time. I feel if my brother, regardless, it's difficult to say, he is 67, and he has had two coronary inclusions [sic], he has had two CV-s. He is not going to live forever. This just would be one more factor of instability in that home. Right now I think that he is very emotional. He has left the Courtroom and returned several times today. My last visit in the home I turned to him and said, 'Dick, what do you want?' Meaning, do you want Michael to stay in Arizona or not, and he just broke into tears and went away. I just don't think he can cope with it. I think what he can't cope with is watching and having a frustration of being unable to help his wife take care of Michael and watching her have the struggle of taking care of Michael and him, and I think this is, this is just unreasonable."

Robert further stated that he thought Roberta was doing an excellent job caring for his brother and was giving him great support. He thought her emotional and mental condition had markedly improved and had no reason to believe she wasn't functioning well in taking care of his brother and the house. He stated he had never had the opportunity to observe how Roberta took care of Michael after she had recovered. When asked how Roberta handled the crisis of his brother's illness, he said:

"A. I think she came through it well, and it would lead me to believe that she was able to function perhaps better under stress than she probably had before. I do not know what psychiatric support she got at that time, whether she required additional visits or medication. . . ."

Robert's wife testified that until Roberta had her breakdown, the Hyatts Sr. appeared to be sufficiently able to cope with Michael's needs.

Dr. Engracio Balita testified on behalf of appellants. He is a psychiatrist practicing in New Jersey. His first contact with Roberta was in July of 1969. She had been confined at the Trenton State Hospital in New Jersey for about seven weeks and had been released. She had been suffering from delusions and when he started treating her, she was "in bad shape." She needed extensive psychotherapy plus chemotherapy. She was still partly delusional and "needed an extensive intensified therapy which was at least once a week." By her second or third visit she was beginning to socialize more and was "really showing signs of improvement."

Aside from a few minor regressions, from which she recovered rapidly, her improvement had been gradual but steady. She had a minor regression in January of 1971 because she failed to take medication but it was not severe enough to hospitalize her. She had never required additional hospitalization and was discharged from his care in April of 1973. He diagnosed her as a schizophrenic, residual type and stated that she was in a state of remission.

According to Dr. Balita people who are diagnosed as schizophrenic might possibly have certain regressions when subjected to undue stress. Sometimes minimal stress could result in a relapse, but under proper therapy such relapse could be "nipped in the bud". He was amazed at Roberta's reaction to her husband's illness because this was a major development in her life and she was able to withstand the stress which ordinarily might cause regression in some patients. She showed no regression or inability to cope with the situation. As a matter of fact, the doctor stated, she became more aggressive when it came to taking care of her husband. She managed very well, handling all the financial details and arranging her husband's transfer from one institution to another. When he finally came home permanently, she was able to give him total patient care.

As to prognosis, Dr. Balita testified that Roberta had very satisfactorily improved. A relapse was improbable if she could call him when she felt things were getting difficult (which she had always done in the past when she was "in a pinch"). He noted that she had been doing without her medication for a long period of time, and yet had still maintained her remission. As far as Dr. Balita was concerned she was then fully competent and had stabilized sufficiently to be able to take care of Michael. He was of the opinion that if she could take care of her husband, she could also take care of her son.

Dr. Balita did not believe there was any probability of risk that Roberta would require hospitalization for any mental condition or would have a serious relapse or regression that would disable her or prevent her from taking care of her son. Since Michael had been taken from her, she had consistently expressed her desire to have him back, but for some reason her husband was reluctant to have Michael return. She had been stable for the preceding two years and had done substitute teaching once or twice a week. She had girlfriends and had joined the Women's Club. Prior to her recovery, she would stay in bed all day. Since her husband's illness she had improved dramatically. She had never given any indication of being a danger to either herself or her husband and had never manifested any sub-destructive tendencies.

According to Dr. Balita, all persons diagnosed as suffering from schizophrenia are considered to have a residual condition. This does not, however, mean there is a likelihood or possibility that they will have a relapse or regression. When pressed under cross-examination as to whether he could guarantee that Roberta would not have a relapse, the doctor replied that he could not guarantee that anyone would not suddenly be subject to an emotional breakdown.

Roberta Hyatt had for the preceding two years been substitute teaching in all grades from Kindergarten to the eighth grade in the New Jersey Public School System. She testified that Michael was returned to the Hyatts Jr. in December of 1969 because she was hospitalized for a urinary infection. She felt that she could take care of Michael after her ten-day hospital stay but her husband disagreed and she acquiesced. She called the Hyatts Jr. in December of 1971 and wanted to bring Michael home for Christmas but it was suggested by Major Hyatt that they wait and he would send Michael back the following summer.

The house in which the Hyatts Sr. reside in Medford Lakes has a market value of approximately $35,000 and is completely paid for. It is in a residential neighborhood where there are many children and the school is one block away. Roberta testified that their annual tax-free income was approximately $13,900. This was corroborated by her husband who testified by means of nodding "yes" or "no".

The testimony of several witnesses was admitted into evidence by way of affidavits. Herman Darkins, stated:

\* \* \* \* \* \*

"4. In giving speech therapy to Mr. Hyatt I depend to a great extent on the emotional support that Mrs. Hyatt provides to her husband. She is able to coax him when therapy becomes difficult and to help him get over the periods of discouragement that all stroke victims occasionally experience. She is unflagging in her support and has contributed greatly to the marked progress that Mr. Hyatt has made.

5. In observing the Hyatts during the past seven months, I have seen great strength of character in both of them. I have seen how they respond to each other and know that they have an exceptionally strong marriage. When they have an argument or disagreement they each speak their minds and the matter is quickly settled with no lingering hard feelings. I know from experience that stroke victims on occasion will become upset and frustrated by their disability and lack of progress in overcoming the disability. This upset can be quite disturbing to a spouse who is unable to take a philosophical view or to a spouse who does not have confidence that they can overcome the travail. I have seen Mrs. Hyatt help her husband get over such blue periods. And, she does it with unwavering faith that things will improve. Such faith is contagious and has been one of the most significant reasons for Mr. Hyatt's improvement.

6. When Mr. Hyatt was convalescing at the Mount Holly Extended Care Center I observed how Mrs. Hyatt came to visit him and talk to him in such a way as to put him in a good mood. She would get him to take his mind off himself.

7. Everything I have seen about the Hyatts leads me to believe that they are outstanding parents and will provide a warm and secure home for Michael. They are loving people and I know from close observation that they will provide the emotional support Michael needs. They live in an exceptionally fine community and enjoy a fine reputation."

\* \* \* \* \* \*

Mildred Price, secretary of the Indian Mills Elementary School, stated that she had seen Mrs. Hyatt daily before Michael's birth and regularly since she started substitute teaching in late 1971. She stated that Mrs. Hyatt performed well as a teacher, was very sensitive to the children, and did a wonderful job of teaching the first six or seven months of her pregnancy.

Dorothy Davis is a teacher in the Philadelphia School System and lives across the street from the Hyatts. She stated that when Mrs. Hyatt was expecting Michael she was looking forward to his birth and was very happy when he was born. She stated that the relationship between Michael and his mother was excellent. Michael had played in her home on several

occasions and was always well cared for and happy.

Edith Giberson is a kindergarten primary teacher in Indian Mills Elementary School, having taught there for more than eighteen years. She knew Roberta Hyatt for five years and saw her daily when she taught during the year she was pregnant with Michael. After Michael's birth, Mrs. Hyatt brought him to school on several occasions. He always appeared happy to her, and was well taken care of. She further stated that during Roberta's first teaching year at Indian Mills she did an outstanding job. According to her, Mrs. Hyatt was very sympathetic to but firm with the children. They knew what was expected of them and liked her as a teacher.

The next-door neighbors of the Hyatts testified as to Mrs. Hyatt's strength in handling her husband's illness and the good reputation of the Hyatts in the community. Also, that Mrs. Hyatt loved Michael and wanted to take care of him and provide for his physical and emotional needs.

The testimony of Richard Hyatt, Sr.'s physician, who had treated him since 1936, indicates that although Mr. Hyatt Sr. was unable to speak, his mind was normal and he knew what was going on about him. He was able to get around by means of a wheelchair which he manipulated himself. There was nothing about his health that would make it dangerous or unwise to have young Michael reared in his home. On the contrary, the doctor was of the opinion that it would be good for Mr. Hyatt Sr. to have his son in his home and allow him to assist in his upbringing.

■ We will not disturb the trial court's determination unless a clear abuse of discretion appears. The facts of this case demonstrate that a gross miscarriage of justice has occurred. The testimony of Richard Hyatt, Jr. to the effect that he would still want his father and stepmother to enjoy a parental relationship with Michael makes this court wonder whether the Hyatts Jr. realize the full import of these proceedings. While the primary consideration is the welfare of the child, In re Anonymous, 4 Ariz.App. 588, 422 P.2d 419 (1967), this does not mean that the court can sever the parental rights of non-consenting parents and order adoption merely because the adoptive parents might be able to provide a better home. In the case of In re Clark, 38 Ariz. 481, 486, 1 P.2d 112 (1931), the court quoted 1 Cal.Jur. 436, § 19 as follows:

"The parents are the natural guardians and cannot be deprived of their right to the care, custody, society and services of their children, except by a proceeding to which they are made parties, and in which it is shown that they are unfit or unwilling or unable to perform their parental duties. Every intendment should be in favor of the claim of the parent upon the evidence, and where the statute is open to construction and interpretation, it should be construed in support of the right of the natural parent[s]."

■ A parent who has never consented to the adoption may not, over his objection, be deprived of his child without a showing of neglect, unfitness, or dependency. In re Adoption of Baby Boy, 106 Ariz. 195, 472 P.2d 64 (1970).

When the evidence is distilled it shows parents able to take care of their child until the mother had a nervous breakdown. She was subsequently discharged by her psychiatrist. Throughout the stress of her husband's illness and the stress of this action she has been able to function normally without any sign of a regression. The most telling evidence was the testimony of Dr. Robert Hyatt that he had not had the opportunity to observe how Roberta could care for her son after her recovery. No one has been able to make this observation.

The state and its courts should do everything in their power to keep the family together and not destroy it. The Hyatts Sr. should be given the opportunity to raise this child. If, for some reason, there is difficulty encountered in New Jersey,

agencies are available which can give the family the needed support while preserving its unity. There are many families in which one parent is incapacitated or only one parent is living, but this does not justify the leviathan power of the state to descend upon it and snatch away a child.

There is nothing in the record of this case which justifies the entry of the adoption order. The finding of the trial court was clearly erroneous.

The order of adoption is set aside and the trial court is ordered to dismiss the petition for adoption.

Reversed.

KRUCKER and HATHAWAY, JJ., concur.