543 P.2d 809

**In the Matter of the APPEAL IN PIMA COUNTY, JUVENILE ACTION NO. S–111.**

**No. 2 CA–CIV 1955.**

Court of Appeals of Arizona, Division 2.

Dec. 18, 1975.

Review Denied June 10, 1976. See 113 Ariz. 247, 550 P.2d 625.

Abruzzo & Wasley, by Anthony J. Abruzzo, Tucson, for appellant.

Bruce E. Babbitt, Atty. Gen., Phoenix, by Charles E. Buri, Asst. Atty. Gen., Tucson, for appellee Dept. of Economic Security.

Stolkin, Weiss & Tandy, by Ronald J. Stolkin, Tucson, for the minor.

OPINION

KRUCKER, Judge.

A juvenile court order severing the parental relationship between a mother and child is the subject of this appeal taken by the mother.

A.R.S. Sec. 8–533 includes as grounds for termination of the parent-child relationship (1) that the parent has neglected the child and (2) that the parent is unable to discharge the parental responsibilities because of mental illness or mental deficiency and there are reasonable grounds to believe that the condition will continue for a prolonged indeterminate period. The juvenile court found that these two grounds for termination existed and ordered severance. The mother now challenges the sufficiency of the evidence to support the court's findings.

The main witnesses who testified in favor of severance were Pat Silver, a caseworker with the Department of Economic Security, Arthur Taylor, a counselor at Southern Arizona Mental Health Center, and Dr. Frederick Maccabe, Jr., a child psychiatrist who worked with the Children's Unit at the Southern Arizona Mental Health Center. According to Silver, in December, 1971, the natural mother came to D.E.S. for services. The mother stated that her parents had ejected her from their home because they did not approve of the way she cared for her son. The grandfather filed a dependency petition, but it was subsequently dismissed. D.E.S. maintained contact with the mother until November of 1972. Subsequently, D.E.S. became reinvolved in June of 1973 because of a referral from Mr. Taylor, who had been working with the mother in therapy. The mother was under much stress at that time and Taylor was afraid she might hurt the child. He accordingly urged the mother to place the child in a foster home. The mother agreed to voluntary placement, which continued until October of 1973, when the child was adjudicated a depend-

ent child. He remained in foster homes until the petition for severance was filed in November, 1974.[1] Silver testified that the mother had visited the child fairly regularly since June of 1973, and that during the eight months before the severance hearing she maintained a schedule of once-a-month visits. The once-a-month limitation was imposed by D.E.S., which had been awarded the care, custody and control of the child in October of 1973. Silver recommended severance because "she had the feeling" that the mother might be relieved if the court took action so she would not have to be responsible for the child. She also felt the mother had done nothing either to ask that the child be returned or to improve her personal life so she could provide a home for the child. Silver admitted, however, that at the time of the hearing (March, 1975), she knew nothing about the mother's financial or home condition. According to Silver, when a decision to request severance has been made and a petition filed, D.E.S. no longer provides social services or contact with the mother other than arranging for visitation. Silver said her opinion that the mother had not tried to get her life together so as to be able to take care of her child was predicated on the mother's conduct during the year and a half before D.E.S. petitioned for severance.

The psychiatrist, Dr. Maccabe, testified substantially as follows. He had had three or four contacts with the mother for periods of 10 to 15 minutes each from April of 1972 to July of 1974. The purpose of these contacts was to evaluate the effects of medication previously prescribed. He had never seen the child. In July of 1974 he wrote a letter to D.E.S. recommending that the parental relationship be severed and the child placed for adoption. In the letter, he stated:

"She has been shown on psychological testing to have many signs of schizophrenic illness, which partially explains her difficulties in relating to her child and her inability to evolve a stable vocational or social adjustment. During treatment she has made only limited progress and has given no indication of being ready or able to assume responsibility for her child. At this point it is unlikely that she will change sufficiently in the forseeable (sic) future to be able to resume care of her child, as her psychological and emotional problems are of a chronic or longstanding nature and have altered very little during our efforts to help her."

At the hearing, the doctor expressed his opinion that it was unlikely the mother would be able to adequately care for her minor child. His stated reason was:

"Oh, combining of the earlier diagnosis of a schizophrenic illness, plus the observations over a period of relatively little change in consistency, reliability, planning, general life adjustment, that sort of thing."

On cross-examination, the doctor admitted that the basis of this opinion was the information furnished to him by Taylor and psychological testing done in 1973. When asked whether any testing or any type of work had been done with the child, the doctor stated:

"No, the child has never been in question in terms of behavior or problems of that sort, nor has the relationship between the child and the mother been at question except to the extent that [mother] has had the trouble with being consistent, with being reliable or responsible and with handling her own feelings under stress and that this has not to my knowledge ever been a question of sort of impaired relationship with the child except under those sort of drastically dangerous moments."

The "drastically dangerous moments" to which the doctor was apparently referring were two incidents in April of 1972 which caused the mother to seek help at the

1. When the petition for severance was filed, the child was approximately 3⅔ years old.

Southern Arizona Mental Health Center. According to Dr. Maccabe, the mother was concerned about injuring the child. Although the doctor was of the opinion that "this is a case of an extreme schizophrenic illness", he admitted that it was possible to cure schizophrenia. Furthermore, although he admitted it was possible that the mother's mental condition had changed from 1973 to 1975, he did not believe it would have changed sufficiently for him to alter his recommendation of severance. According to the doctor, the fact that the mother was then doing a good job at work and had a more permanent residence than before would not alone indicate that she would be able to take responsibility for the child. He stated:

"I find that up to a month ago she was not working or up to three months ago she was living elsewhere. There has been very recent changes (sic). *If I were considering her for adoption* I would want to see that she had been vocationally and residentially and socially stable for at least a couple of years. And, an unfortunate thing is we don't have that kind of time lag." (Emphasis added)

The doctor stated that his concern for any child is that it have a stable, steady home of some sort and that the stability be consistent. He was not sure the mother was ready at that point to take over the care of the child. When asked whether the mother would be able to seek help from the Southern Arizona Mental Health Center to overcome her problems if severance were not ordered and the status quo maintained, he responded:

"Yes, of course. It might be with our having had to take this kind of a stand that she might prefer to start with somebody who she would feel more comfortable with. That I couldn't see as any objection in that. I think she should have her choice. The only caution I would offer the Court is that it's just— well, it's that much more time in the child's life which is pretty crucial, five,

six years, I would think. It's more important and I think I wouldn't recommend continuation unless there was some relation. I find it a difficult thing to have to put into words and I am sorry to have to say it this way. I wish I didn't have to do it.

Q. So, at this time in the child's life, some kind of final disposition would be in his best interest?

A. U-huh."

The doctor responded as follows concerning the effect on the child of continued foster care:

"A. It's not directly predictable. In other words, it's a question of how strong the child's inner resources are and what sort of things do happen. If I'm able to say that the child is likely to continue to have the difficulties, then I would like to do something to prevent it for the child's sake.

Q. Would it be safe to assume that any such bouncing around would be detrimental in some facet or another to the child?

A. Yes."

The doctor admitted he had never seen the child and his recommendation of severance was "not made on the child but on the difficulty his mother has had in providing a consistent home for him."

Art Taylor, the therapist, testified substantially as follows. His first contact with the mother was in the latter part of January, 1973. He saw her at a routine intake "where she wanted to have her son evaluated". During the interview, however, the mother mentioned several occasions when she had physically abused the child—an attempted smothering with a pillow and an uncontrolled slapping of the child. The child, then approximately one and a half years old, accompanied the mother. According to the therapist, he observed no particular abnormality in the child's behavior and concluded that the child had no emotional disorder. The therapist was of the opinion that the mother

had come to him because she was concerned about her reaction to the child. At a subsequent staff consultation, the information elicited from the mother at the intake was evaluated. The staff recommended that because of the mother's fear for the child's safety, the child be placed for adoption. It was also recommended that the mother should have continued individual counseling, chemotherapy and psychological evaluation, because she was suffering from emotional and financial hardship and lacked "lifelines". Taylor conveyed to the mother the staff's recommendation that she voluntarily relinquish the child for adoption and she agreed to do so. The child was taken to the Arizona Children's Home, which indicated that no final action would be taken toward adoption unless the mother still wanted to relinquish the child after several weeks had passed.

When the child's grandparents became aware of the situation, they removed him from the Children's Home and took him to their home in Sierra Vista. In April of 1973 the grandparents experienced marital problems and were contemplating a divorce. At that time the mother took the child back to Tucson. In the interim, counseling sessions with the mother had commenced. It was recommended to the mother that she have the child placed in a foster home and, according to Taylor, during the time he was seeing the mother he suggested several times that she consider allowing the child to be adopted. The reason he suggested foster home placement was that the mother was having problems, was becoming more involved with alcohol, had no job, and was "neglecting" the child. Taylor testified:

"Q. Was Jaime neglected at this time?

A. In a manner of speaking he was. For example, [mother] when she worked at the computer center worked evenings, or the graveyard shift rather. And I think she would leave Jaime with the babysitter or have this friend that she was living with care for Jaime while she was working. And then she'd care for him when she got off of work. Well, I don't know, cared for him, she would be in the same house as Jaime would be in. But being on the graveyard shift, [mother] would sleep, from what I understand, most of the time, leaving Jaime to his own.

Q. Did you ever mention this situation to [mother]?

A. Yes.

Q. What was her reaction?

A. She indicated that there wasn't much to discuss, that was Jaime's predicament and that he'd just have to fit into her lifestyle."

In June of 1973, the mother agreed to place the child in a foster home.

After the child was placed in the foster home, the therapist planned to work with the mother with a view to developing a consistent life for her. According to him, there was always progress made and then the mother would "fall back and just blow whatever she had achieved up to that point." It was recommended to the Department of Economic Security during the next year that the child not be returned to the mother until she became more self-sufficient and had some financial reserves to fall back on. In early 1974 the mother went to California and established herself in a new job. The therapist received several letters from her telling him when she would be in town and asking if he could see her then. He saw her and was very impressed with her progress. In May of 1974 he wrote a letter to the Department of Economic Security in which he indicated that the mother's emotional and financial stability had improved but that she was still somewhat disorganized. He suggested that two alternatives be presented to her: voluntary relinquishment of the child for adoption, or her resumption of custody of the child with at least one year supervision by the California welfare agency.

In June, 1974, the mother returned to Tucson, having lost her job in California. She later found employment and, according to Taylor, was planning to hold two jobs. He thought this was inconsistent with her desire to have her child back. He last saw the mother in his office in August of 1974 to discuss Dr. Maccabe's recommendation of severance with her. In September Taylor was called to the emergency room at the Arizona Medical Center, where the mother "apparently was having some sort of anxiety reactions in which she was almost in a state of shock." (It appears from the record that this occurred immediately after Silver discussed severance with the mother.)

Taylor also testified that the mother called him at home one evening in October because she was scared and seemed to be having a personality conflict she didn't know how to handle. He was of the opinion that it was very unlikely the child would be afforded a "stable, consistent home environment" with his mother. The chances for the mother improving her situation, said Taylor, depended on whether she would follow previous recommendations as far as living a consistent, financially-residentially secure life and continuing therapy. He indicated he would be more optimistic about returning the child to the mother if she could live a stable life for a year or more. The possibility of having the child adopted, according to the therapist, had been explored with the mother on several occasions including her initial visit in January, 1973. Adoption was always the recommendation of the Southern Arizona Mental Health Center, but with the exception of her initial acquiescence in January of 1973, the mother had always opposed the idea. When asked what reason the mother might have in refusing to allow the child to be adopted, the therapist responded:

"I don't see any logical reasons. I imagine it's all her own emotions and may be maternal instinct, if you want to say that, to keep her child; that's understandable."

\* \* \* \* \* \*

It's my opinion that [mother] very sincerely wants her child back. It's also my opinion that from her past history she may be asking for something that almost met tragic ends in the past. And over the past two years there doesn't seem to be any particular sign that [mother] is maybe wanting to or maybe proving to herself that to provide a stable home for the child. It's kind of like the old—or the new—cliche that some child abusing parents have to think of and that is number one, I love my child very much but do I want to be a parent to my child?

And I think in [mother's] case she wants to be the mother of Jaime, but I don't have the feeling that she's ready to accept the parental duties of Jaime."

The therapist testified that it would be detrimental to the child to wait in limbo in a foster home rather than settling immediately into a firm, substantial, secure environment. Based on the mother's past experiences, he saw no reason to hope for a significant increase in her stability. His recommendation was that for the child's sake it would be best to place him immediately in a stable, secure home environment rather than waiting out the possibility that sometime in the future the mother might rehabilitate herself.

A psychologist who tested the mother during the severance hearing testified in May of 1975. According to him, none of the tests showed any signs of schizophrenia or any other psychosis. His expressed opinion, based on the test results and his clinical evaluation of the mother, was that she was able to manage her own affairs and he could see no reason why she could not provide for her child at that time. He had interviewed the mother initially, tested her, and interviewed her at the conclusion of the testing period for approximately four to five hours. The psychologist was

extensively cross-examined concerning his written psychological evaluation, which contained the following summary:

"Ms. ———— is a very bright 26 year old woman with a history of emotional problems during the past few years. Her problems have involved difficulties with authority figures, a problematic marriage of short durations (sic), difficulties in the responsibility of motherhood, a significant struggle against alcoholism, and difficulty in achieving a satisfactory and meaningful work adjustment. During the past year, however, she apparently has worked diligently to rectify personal and situational difficulties in such a fashion as to have emerged as a relatively stable individual who manages her life in a structured and stable fashion.

Diagnostically, there are no indications of schizophrenia based on disordered thought processes or content. There are also no indications of psychosis based upon disordered affect or emotion. There are residual indications of personality problems with which Ms. ———— is attempting to deal in a constructive fashion in terms of the development of a structured lifestyle with meaningful work activity. While she continues to have some personality problems particularly in relationship to authority figures, there are no indications that this woman experiences severe personality disorganization which would seriously interfere with her ability to manage her affairs. Furthermore, there are no indications of such severe impairments of psychological functions as to prevent this woman for providing care for a child at this time."

The mother's employer also testified at the May hearing. He stated that the mother had been working as a secretary and researcher for his firm, which was then engaged in microfilming a collection of books on American history. He rated her performance as excellent, stating:

"She has an intuitive sense of learning and I think the diligence towards histori-

cal facts that I find rather amazing in someone who is untutored as a historian who obviously has an interest in it but no past knowledge of the discipline itself; but I would say that she has grasped it within the framework of what we have done so far."

The mother, according to him, had shown a great deal of interest in her job and was a "self-starter". She had been left in charge of the office at various times and was diligent and stable in her job. She was then earning $100 per week gross salary and there was a possibility of periodic increments. The employer was of the opinion that her young son was her main interest in life, based upon his observations of the mother and discussions with her concerning the child.

In 1970, the State Legislature amended Title 8, Ch. 5 by adding Art. 2, Sec. 8–531 through Sec. 8–544. Laws 1970, Ch. 153, Sec. 2. The purpose of these sections, which provide for termination of the parent-child relationship, was stated in Ch. 153, Sec. 1:

"The purpose of this act is to provide for voluntary and involuntary severance of the parent-child relationship and for substitution of parental care and supervision by judicial process which will safeguard the rights and interests of all parties concerned and promote their welfare and that of the state. Implicit in this act is the philosophy that, wherever possible, family life should be strengthened and preserved and that the issue of severing the parent-child relationship is of such vital importance as to require a judicial determination in place of attempts at severance by contractual arrangements, express or implied, for the surrender or relinquishment of children. This judicial action is intended primarily for those situations where other judicial remedies appear inappropriate."

The right to custody and control of one's children is a fundamental one. *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Appeal in Pima*

*County, Juvenile Action No. J–46735 v. Howard,* 112 Ariz. 170, 540 P.2d 642 (1975). We recently pointed out that severance of the parent-child relationship is a serious matter and should not be considered a panacea; rather, it should be resorted to only when concerted effort to preserve the relationship fails. *See, Arizona State Dept. of Economic Security v. Mahoney,* 24 Ariz.App. 534, 540 P.2d 153 (1975). In *Caruso v. Superior Court,* 100 Ariz. 167, 412 P.2d 463 (1966), it was held that a parent's right to his child could only be overcome by a showing of unfitness.

■ We are of the opinion that severance of the relationship between this mother and her child was at this juncture erroneous. We are not bound to accept the lower court's findings of fact when, as here, we are definitely and firmly convinced, on the basis of all the evidence, that a mistake has been committed. *Wackerman v. Wackerman,* 16 Ariz.App. 382, 493 P.2d 928 (1972).

■ Different considerations apply in divorce-child custody cases than in termination of parental rights cases. The latter type go far beyond the child-centered question of custody during minority—it involves a different kind of right: the subjective tie between a parent and child, the right of a parent to be identified with her child for emotional, religious or other reasons. *See, In re Adoption of Smith,* 229 Or. 277, 366 P.2d 875 (1961).

As to the mother's "mental illness", i. e., schizophrenia, the evidence pertaining thereto is primarily the testimony of Dr. Maccabe, whose opinion in July, 1974, that he saw little basis for recovery, was based on 1973 testing of the mother, the therapist's evaluation, and his brief contacts with her on three or four occasions from April, 1972 to July, 1974, for the purpose of evaluating the effects of medication. He admitted that schizophrenia is curable and that if the status quo was maintained, the mother could have help. It is apparent, however, that his recommendation of severance was colored by his opinion that the best interests of the child would thereby be served. He pointed out that the most beneficial environment for a child is with parents who are emotionally and socially stable and that there are many such parents. On the other hand, the later psychological testing in 1975 was the basis for the clinical psychologist's opinion that the mother was not schizophrenic. Furthermore, apart from the 1972 incidents that caused the mother to realize she had a problem and resulted in her seeking help, there is no evidence that her "instability" in fact caused harm to the child. It is at least arguable that the repeated suggestions that she voluntarily relinquish the child for adoption may have contributed to such "instability".

The evidence reflects that despite her emotional problems, the mother attempted to secure various jobs and was moderately successful in maintaining them. True, the duration of her various jobs was not extended. But this is not an unusual situation in our society today. Further, at the time of the severance hearing the mother's employment status and living situation had stabilized for a period of several months. She was apparently making an effort to supply "the stable environment" which had been recommended. Whether she was motivated solely by the fear of losing her child as a result of the impending severance hearing is not material. As we said in *Hyatt v. Hyatt,* 24 Ariz.App. 170, 536 P.2d 1062 (1975):

> "The most telling evidence was the testimony . . . that he had not had the opportunity to observe how Roberta could care for her son after her recovery. No one has been able to make this observation.
>
> The state and its courts should do everything in their power to keep the family together and not destroy it. . . . If, for some reason, there is difficulty encountered . . ., agencies are available which can give the family the needed support while preserving its uni-

ty. There are many families in which one parent is incapacitated or only one parent is living, but this does not justify the leviathan power of the state to descend upon it and snatch away a child." 536 P.2d at 1068–69.

The subject child had not been with his mother since June of 1973, and the only time he spent with her from that time until the date of the hearing had been the "visitation" time allowed by D.E.S. It is true that the mother acquiesced in the foster home placement and did not actively seek to have the child returned to her. However, it is apparent that during this period she was trying to achieve the goals delineated by the therapist and consistently refused to relinquish her child for adoption. She periodically made progress and then regressed, according to the therapist, who had established lifestyle guidelines for her. No attempt was ever made to allow the mother to assume parental responsibility with support of assistance in the form of counseling, psychotherapy and medication.

■■■ Under these circumstances, we cannot agree with the juvenile court's finding that she was unable to discharge parental responsibilities because of mental illness and there were reasonable grounds to believe that the condition would continue for a prolonged indeterminate period of time. In fact, the record reflects reluctance to maintain the status quo with a view to preserving the mother-child relationship because it would be better for the child to be placed in an adoptive home. This is not the controlling criterion in deciding whether or not to terminate the relationship. *In re Adoption of Smith*, supra. We agree with the following statement of the Oregon Supreme Court in *State v. McMaster*, 259 Or. 291, 486 P.2d 567 (1971):

" . . . [W]e do not believe the legislature contemplated that parental rights could be terminated because the natural parents are unable to furnish surroundings which would enable the child to grow up as we would desire all children to do." 486 P.2d at 572.

In *McMaster*, supra, the appellate court reversed a decision terminating parental rights in a four-year-old child. The child was born out of wedlock and the parents were subsequently married. At two months of age she was taken from her mother and placed in emergency custody. She was later made a ward of the juvenile court and placed in a foster home. The foster parents, with whom the child had remained, wished to adopt her, but the natural mother refused to consent. The substance of the evidence was that the original removal was based on conditions in the home and the neglect of the child; subsequently, the primary problems were the mutual instability of the parents, and numerous separations and lack of concern and consistency that the parents might have for anyone else who might be living in the home; inability to manage money; frequent moving; the parents frequently quarreled; the father never held a job more than a month and seldom that long; they were usually on welfare, and the father often left home with the welfare checks, leaving the mother destitute. There was also uncontradicted evidence that if the child were taken from the foster parents and placed with the natural parents, it would have a serious detrimental effect on the child, primarily because she had lived with the foster parents almost all her life. The Oregon court, in deciding in favor of the natural parents in the termination proceeding, pointedly stated that such decision did not result in the child being transferred to the custody of her natural parents. It merely decided that the natural parents' rights could not then be terminated.

We believe the evidence here of the mother's "condition" falls far short of the evidence presented in *State v. Blum*, 1 Or. App. 409, 463 P.2d 367 (1970). In that case the child involved was born September 30, 1962, and the mother was commit-

ted to the State Hospital in July, 1963. At the time of the May, 1967 hearing on the petition to terminate parental rights, she had been in and out of the State Hospital four times. Two psychiatrists testified concerning her condition. The diagnosis of one was "personality pattern disturbance, inadequate personality superimposed on schizophrenic reaction, chronic, simple type." 463 P.2d at 368. The other testified that she suffered from chronic paranoid schizophrenia and his prognosis was that she would never be able to care for the child. The record also showed that the mother's illness, in its recurrent serious manifestations, included frequent bizarre hallucinations, often involving feelings of severe physical persecution by the doctors in whose charge she was placed; long, continued periods of depression in which she was hysterical and cried continuously; refusal to accept simple responsibility involving her own personal care; and rejection of any responsibility for her child. Also, when not in the hospital she was under supervision in boarding-house situations and had shown no interest in the child until April of 1967. The court stated:

"Here, there is little prospect that the child can ever be in the mother's care; indeed, there is little prospect the child will become other than a boarder with any family if the mother's rights remain outstanding." 463 P.2d at 370.

 We also do not agree with the finding of the trial court that the mother had neglected the child. The expression "neglect" has no fixed meaning; its meaning varies as the context of circumstances changes. *In re Pima County Juvenile Action No. J–31853*, 18 Ariz.App. 219, 501 P. 2d 395 (1972). A.R.S. Sec. 8–531(9) defines the term "neglected" for purposes of Art. 2:

" 'Neglected' used with respect to a child refers to a situation in which the child lacks proper parental care necessary for his health, morals and well-being."

Thus we see that neglect is defined primarily in terms of parental conduct. The definitions of neglect offered by legal scholars are similar. For example, Professor Sanford Katz states that "child neglect connotes a parent's conduct, usually thought of in terms of passive behavior, that results in a failure to provide for the child's needs as defined by the preferred values of the community." S. Katz, *When Parents Fail*, 1971, at 22. Professor Katz is of the opinion that the absence of precise standards for state intervention is a necessity:

". . . neglect statutes recognize that 'neglectful' behavior can also vary, and thus cannot be easily or specifically defined. . . . The broad neglect statutes allow judges to examine each situation on its own facts." Id at 64.

What is proper parental care? In 1870, in a highly controversial decision, *People ex rel. O'Connell v. Turner*, 55 Ill. 280 (1870), the Supreme Court of Illinois declared unconstitutional an 1867 statute providing for commitment to reform schools for children between the ages 6 and 16 "who are destitute of proper parental care, and growing up in mendicancy, ignorance, idleness, or vice." The court saw the provision as encroaching too deeply into the constitutionally protected rights of a parent to raise his child as he sees fit:

"What is proper parental care? The best and kindest parents would differ, in the attempt to solve the question. No two scarcely agree; and when we consider the watchful supervision, which is so unremitting over the domestic affairs of others, the conclusion is forced upon us, that there is not a child in the land who could not be proved, by two or more witnesses, to be in this sad condition. . . . Before any abridgement of the right [to custody], gross misconduct or almost total unfitness on the part of the parent, should be clearly proved." 55 Ill. at 283–85.

 We have recognized that parents enjoy a constitutional right with regard to raising their children and that a child has

a right to be with his natural parents, *Hernandez v. State ex rel. Department of Economic Security*, 23 Ariz.App. 32, 530 P.2d 389 (1975). We are of the opinion that termination of the parent-child relationship on the grounds of neglect requires a showing of serious harm to the child, be it physical, mental, or "moral". *See*, Wald, State Intervention on Behalf of "Neglected" Children: A Search for Realistic Standards, 27 Stan.L.Rev. 985 (1975); Note, Child Neglect: Due Process for the Parents, 70 Col.L.Rev. 465 (1970).

The sum and substance of the evidence presented here as to lack of proper parental care is that the mother's "lifestyle", if allowed to continue, would be detrimental to the child and that he deserves a more stable environment. The mother, when she sought help at the Southern Arizona Mental Health Center, did not manifest unconcern for her child's well-being, but rather the contrary. From the time she agreed to foster home placement in 1973, she has had no opportunity to demonstrate her ability to provide "proper parental care". To deprive her of her right to raise her child and concomitantly to deprive her child of the love and affection of his natural mother, on this meager showing, we cannot sanction. In effect, we would be punishing her for trying to improve her situation

emotionally and physically so that she could take care of her child. Whether or not she is ready and able to resume custody of her child is a question we do not answer. We merely hold that the evidence did not warrant termination of the parent-child relationship.

Reversed.

HOWARD, C. J., concurring.

HATHAWAY, Judge (specially concurring).

I concur with the result reached by the majority, but I do not agree with all their reasons nor with their analysis of the record.

The court faced a dilemma in dealing with the competing interest of attempting to retain the family unit intact and taking the time necessary to determine whether this was possible, contrasted with the desirability of a prompt adoption placement. Resolving the problem by providing a permanent and stable home was, of course, the court's aim. Both results may be achieved with a little more time. I am not persuaded from the record that an adequate effort was put forth to retain, repair and strengthen the family unit, thus my concurrence in the result.