501 P.2d 395

**In the Matter of the Appeal in PIMA COUN-TY JUVENILE ACTION NO. J-31853.**

**No. 2 CA-CIV 1270.**

Court of Appeals of Arizona,
Division 2.

Oct. 2, 1972.

Schroeder, Soelter & Rosenthal, P.C. by Larry S. Rosenthal, Tucson, for appellant.

Gary K. Nelson, Atty. Gen., by Howard L. Fell, Asst. Atty. Gen., Tucson, for appellee.

HATHAWAY, Judge.

This appeal is taken by the mother of a minor adjudicated by the juvenile court to be a dependent child.

On May 5, 1972, a petition was filed invoking the jurisdiction of the juvenile court for purposes of declaring the subject minor a dependent child. The petition alleged:

"Said child's home is unfit for her by reason of abuse by the parent in that during the period September 1971 to the present, said parent caused the deterioration of the child in that the parent failed to maintain reasonable care and treatment of the child by failing to send her to school, subjected or exposed said child to emotional and mental abuse or damage, thus endangering said child's well-being."

The petition was based on an affidavit of the child's father which stated *inter alia* that he and the mother were divorced on June 11, 1971, that the child had been in the sole and exclusive custody of the mother since the date of divorce, that they had been living in California until approximately March 1972 when they returned to Tucson and checked in at the Tidelands Motel, that the mother had been examined by her family physician and surgeon who made a diagnosis of cancer and that surgery had been performed in the latter part of March. It further stated that the mother was presently recuperating at the motel, that the child

had not attended school since Christmas of 1971 and was not adequately fed, that the mother was not emotionally stable, that a psychiatrist had found the child to be "emotionally affected" and that the father was ready to make a home for his daughter and do all things necessary to provide her with a normal childhood.

A hearing was duly held on June 8, 1972. The child's mother and father testified as did the mother's physician, a welfare worker assigned to the case, a clinical psychologist, and an employee of the Tidelands Motel. At the conclusion of the hearing, the court spoke to the 9 year old child in chambers and the record reflects that the court's impression of the youngster was that she was very precocious and extremely intelligent. The court concluded that since the conditions where the child was living were such as to cause concern, particularly the fact that she was not going to school, and the fact that she appeared to be living in somewhat of an isolated existence. she came under the definition of a dependent child.

A.R.S. § 8–201, subsec. 10, par. b, as amended, defines a "dependent child" as one who is adjudicated to be:

> "Destitute or who is not provided with the necessities of life, or who is not provided with a home or suitable place of abode, or whose home is unfit for him by reason of abuse, neglect, cruelty, or depravity by either of his parents, . . ."

■ The welfare of a child is the prime consideration of a juvenile code. State v. McMaster, 486 P.2d 567 (Or.1971). If the evidence presented to the juvenile court is sufficient to support a finding of dependency, we as a reviewing court do not interfere. In re Schubert, 153 Cal.App. 2d 138, 313 P.2d 968 (1957); McNatt v. State, 330 P.2d 600 (Okl.1958); Sernaker v. Ehrlich, 86 Nev. 277, 468 P.2d 5 (Nev. 1970). In the instant case, however, with all due respect to the juvenile court's opportunity to assess the credibility of the witnesses, we are of the opinion that appellate intervention is appropriate. True, the burden of proof in a dependency adjudication is merely a preponderance of the evidence. Rule 17(a)(2), Rules of Procedure for the Juvenile Court, 17 A.R.S. Our review of the evidence leads us to conclude that this burden was not met.

Viewing the evidence most favorable to support the order of the juvenile court, we find the following. The mother withdrew the child from school in California midway through the school year with the consent of the school authorities, the idea being that a trip to Europe would serve an educational purpose. There is no question but that the youngster was very bright and had no difficulty keeping up in school. The mother appears to have been inordinately fearful of having cancer but her fears were not groundless since, after coming to Tucson to be examined by the former family physician it was discovered that she did have a uterine cancer requiring surgery. She arranged for the child to stay at the home of the physician while she was in the hospital and then returned to the Tidelands Motel with the child to recuperate.

According to the mother, she attempted to enroll the youngster in a private boarding school so that the child could have "all around care" but was unsuccessful. She explained that she had not enrolled the child in public school because it would create an additional burden. Furthermore, she assumed, from what the doctor had told her, that she would be able to travel within four weeks. Also, it was her understanding that she had permission to keep the child out of school for the remainder of the school year. Although she made no attempt to obtain a tutor for the child, she did get "learning books on math and science" which the child worked on and the mother graded. After the filing of the petition in juvenile court, the child was placed in a foster home and attended public school for about a month. She did very well in school notwithstanding her absence of several months. She was promoted and

received an award. There was some testimony that the mother was "possessive" and wanted the child close to her. Also, during the stay at the motel the child had little opportunity for contact with her peers.

The welfare worker assigned to the case testified as to the mother's fitness:

"A. I feel there is a possibility that she is unfit without some outside influence and supervision.

Q. What do you base that on?

A. On what had happened during the past six months, from the testimony of Dr. G. [the family physician] and other people I have talked to.

Q. Isn't your main concern the fact that [the child] was not in school?

A. Yes.

Q. And the fact that she hasn't been with other children during this period?

A. Yes."

A report prepared by a staff psychiatric social worker for Southern Arizona Mental Health Clinic recommended that the child be made a temporary ward of the court, that a psychiatric evaluation of the mother be obtained and that she be given assistance to help her through "her current emotional crises." We are inclined to discount the evidentiary value of this report since it was based solely on a consultation with the child and her father.

The child was examined by the mother's psychologist and by a psychiatrist hired by her father. The report of the latter stated, in part:

"From my observations, it is my impression that this child has no major emotional disturbance. From the adjustment she appears to have made in the foster home, she is not overly dependent on her mother, even though their life together would seem to have promoted this.

\*　　\*　　\*　　\*　　\*　　\*

In summary, it is my impression that [the child] is a precocious, bright 9 year old girl, who has been somewhat socially isolated from peers and relates more easily to adults, and adjusts easily to new situations. She is dependent, but not to a pathological degree, on her mother and sees her mother as offering the most security in her future. She is mildly anxious, which is appropriate to her situation at the moment. There is no evidence of serious emotional disturbance."

The mother's psychologist, as the result of two consultations with the mother and one with the child, testified that he found no reason to conclude that the mother was unfit or that the child's well-being had been endangered by the mother's conduct during the preceding few months. He expressed lack of concern over the fact that the child had not been in school in view of her obvious potential and her very adequate school progress and adjustment. Further, he discounted the child's lack of association with her peers:

"Q. Was there anything you could tell in your examination of [the child] that this lack of dealing with children of her own age might have adversely affected her?

A. I'm aware this is one of the very favorite sacred cows with regard to children. I don't think it's really as significant or important as to the degree it's often emphasized. I think this partly depends on the individual; in other words, let's say this is something that a child is very much seeking and is having difficulty doing it so that it, then, becomes a frustration and a source of dissatisfaction, then it may well represent a problem to that child.

Now [the child], on the other hand, doesn't seem to have that much of a need for contact with other people. As I say, she's a very self-contained young lady, and is able to occupy her time with her own interests and activities and pursuits, and generally keeps pretty busy with them so that it's not a source of frustration to her. I think this is an important distinction."

When cross-examined as to the fact that the child and her mother had been living at a motel, the psychologist testified:

"Q. Did this in any way disturb you that these two people, that a nine-year-old child had been living in a motel room, was there anything unusual about that?

A. I don't see that it's too different from an apartment the way motels are these days.

Q. Are you speaking of facilities for food?

A. Just living arrangements, the availability of services, et cetera, it was probably much handier for them than an apartment would be.

Q. Do you feel [the child] is normal in the social relationship be it one of the hangups we have?

A. I think she is able to relate to other children as the circumstances may require."

It is apparent that the juvenile court based its adjudication of dependency on a conclusion that (1) residing at the Tidelands Motel constituted a failure to provide a suitable place of abode, and (2) the subject minor was neglected because she was not attending school and was disassociated from her peers. We find, under the circumstances presented here, that we are unable to concur with the adjudication of dependency.

The recommendation of the Pima County Department of Public Welfare was that the child be placed in its care, custody and control, with return to the mother at the discretion of the welfare department. The court ordered the child placed in the temporary care, custody and control of the welfare department. Physical custody of the child was restored to the mother with the proviso that such placement might be changed at the discretion of the welfare department "consistent with the well-being of said child." It further prohibited removal of the child from the State of Arizona until further order of the court and directed that there be an annual review.

The expression "neglect" is not a term of fixed meaning—its meaning varies as the context of circumstances changes. 47 Am.Jur.2d Juvenile Courts, Etc., § 24 (1969). One court has defined the term as the disregard of duty owing to indifference or willfulness. See In re Vilas, 475 P.2d 615 (Okl.1970). The record here reflects quite the contrary—the mother was extremely devoted to the child. We cannot equate the mother's concern with her physical health, even if some individuals considered it exaggerated, with indifference to the child's needs. In fact, we conceive that it is only natural that a mother be concerned about her health lest she be unable to fulfill her responsibility of caring for her young daughter.

Living at the motel, a situation clearly engendered by the circumstances, was no more than a makeshift arrangement. There was no showing that the child's physical or mental health were in jeopardy. In fact, her "confusion" was more likely precipitated by the conduct of others who did not approve of the child's "life-style."

While we agree that the child's non-attendance in school was a factor to be considered, we believe that undue emphasis was given it in view of the mother's belief, misguided though it may have been, that she had the approval of the California school authorities to keep the child out of school even if the trip to Europe did not materialize. We are also of the opinion that undue emphasis was placed on the fact that the child was deprived of association with her peers. As the testimony of the psychologist indicates, the salutary effect of such association cannot be decided in a vacuum. Rather, it must be considered in the light of the individual child's needs and situation. Here the record reflects neither unhappiness nor frustration on the part of the youngster nor any inability to adjust to a peer group setting.

Our review of the record convinces us that the sum and substance of the evidence in support of the petition reflects nothing more than an opinion of what an ideal

home atmosphere *should* consist of, rather than a showing that *this* child's well-being was being endangered. Nor do we find sufficient evidentiary support for a finding of neglect. We believe the following statement of Chief Justice Rosellini, dissenting in Todd v. Superior Court, 68 Wash. 2d 587, 414 P.2d 605 (1966) is apropos:

> "Again, there was no finding that the home was an unfit place for the child. There was no showing that the mother neglected her, or was cruel to her, or that she acted in a depraved manner. . . . I do not think that the legislature intended this section to authorize the court to deprive a parent of the custody of his child simply because the parent is suffering from a mental illness, unless that illness causes him to mistreat or neglect the child or renders the home an unfit place, not merely an imperfect place, for the child.

> The mental illness of a parent will, of course, affect the attitudes and emotional well-being of a child; so will a physical illness, or any number of anti-social attitudes which are not necessarily classified as mental illnesses. I do not think that the legislature meant to empower the court to take charge of a child whenever its parent was not providing it with a perfectly healthy home atmosphere, for the perfect parent is the exception and not the rule.

> It is, of course unfortunate that a child should be subjected to the influence of its parent's delusions or prejudices or hostilities; but this is one of the hazards of family membership. I do not find in the statute an expression of legislative intent that parents who are devoted to their children should be deprived of their custody because of defects in their own personalities unless those defects have a seriously adverse effect upon the child." 414 P.2d at 612–613.

For the foregoing reasons we believe the adjudication of dependency is not supported by a preponderance of the evidence.

Therefore, the order is reversed and the cause is remanded with directions to dismiss the petition.

KRUCKER, C. J., and HOWARD, J., concur.