945 P.2d 1321

**ARIZONA DEPARTMENT OF ECONOMIC SECURITY, Appellant,**

v.

**GERALD F., Appellee.**

**No. 1 CA–JV 96–0133.**

Court of Appeals of Arizona, Division 1, Department A.

Sept. 11, 1997.

Grant Woods, Attorney General by William W. Owsley, Assistant Attorney General, Bruce Griffin, Assistant Attorney General, Phoenix, for Appellant ADES.

Deborah Varney, Phoenix, Guardian ad litem for the Minor Child.

Hendrickson, Fuller, Dutson & Quindry, P.C. by Gary C. Hendrickson, Mesa, for Juvenile.

Helm & Kyle, Ltd. by Theodore L. Kyle, Tempe, for Mother.

Steven G. Smith, Mesa, for Father.

Richard M. Romley, Maricopa County Attorney by Judy Huddleston, Deputy County Attorney, Mesa, for State.

Dean W. Trebesch, Maricopa County Public Defender by Shellie F. Smith, Deputy Public Defender, Phoenix, for Juvenile.

GRANT, Judge.

In this consolidated juvenile delinquency and dependency case, the Arizona Department of Economic Security ("D.E.S.") appeals the juvenile court's order that Gerald F. ("Juvenile") be placed in a residential comprehensive transitional educational program in Florida, and that D.E.S. pay fifty percent of the placement costs. This court has jurisdiction over the appeal pursuant to Arizona Revised Statutes Annotated ("A.R.S.") section 8–236 and Rules 24 to 29 of the Arizona Rules of Procedure for the Juvenile Court. The juvenile court's order, filed on August 8, 1996, is an appealable final order. *Maricopa County Juvenile Action No. J–74197*, 20 Ariz.App. 567, 569, 514 P.2d 738, 740 (1973). D.E.S. is an aggrieved party in this action and has standing to appeal pursuant to A.R.S. section 8–236(A). *Pima County Juvenile Action No. B–9385*, 138 Ariz. 291, 293, 674 P.2d 845, 847 (1983). For reasons that follow, we affirm.

## FACTS AND PROCEDURAL HISTORY

The juvenile court acquired jurisdiction over Juvenile when he was fourteen through the filing of four petitions: three delinquency petitions (JV–511597) filed on April 29, 1995, August 28, 1995, and September 20, 1995, and a dependency petition (JD–501693) filed by Juvenile's guardian ad litem on March 27, 1996. The juvenile court consolidated the cases on May 29, 1996. The dependency petition was filed because Juvenile's mother was incarcerated; his father could not control him; and he was affiliated with gangs, running away and engaging in criminal activity. Juvenile was made a temporary ward of the court in a dependency matter on March 28, 1996. At that time, Juvenile was held in detention on the delinquency charges and was also held in the probation department's custody pursuant to a temporary custody warrant issued on December 4, 1995.

## I. The Competency Hearing

An evidentiary hearing regarding Juvenile's competency was held on April 8, 1996. At the competency hearing, the court considered the testimony and evaluation reports of two psychologists, Dr. James Huddleston and Dr. Susan Parrish. Dr. Huddleston testified Juvenile is mildly mentally retarded and has serious deficits in both verbal and nonverbal abilities. However, Dr. Huddleston also testified Juvenile is competent to stand trial because he could understand the difference between right and wrong and had a basic understanding of the roles of his attorney and the judge.

Dr. Parrish testified Juvenile suffered from dementia due to impaired brain function and also from aphasia, a difficulty in expressive and receptive language. *See Diagnostic and Statistical Manual of Mental Disorders* ("DSM–IV") § 780.90 (4th ed.1994). In her opinion, Juvenile was not competent to be tried because he could not understand abstract thoughts such as his right to confront witnesses and the concept of presentation of evidence. She recommended placement for Juvenile that focused on teaching him concrete tasks such as basic living skills. She testified Juvenile's brain functioning was so limited that very elementary academic tasks, such as basic reading and mathematics, were too abstract for him. The juvenile court held Juvenile was competent to stand trial. However, the court also held Juvenile was not competent to waive his constitutional rights because of his limited intelligence.

## II. The Disposition Hearing

The juvenile court ordered an evaluation by psychiatrist David S. Burgoyne II, M.D., to assist the court in deciding the appropriate disposition for Juvenile. In his report concerning the evaluation on July 17, 1996, Dr. Burgoyne stated Juvenile had a long history of antisocial behavior patterns and was developing a substantial antisocial personality disorder. Significantly, Dr. Burgoyne stated Juvenile "[D]oes not have a significant mental disorder that requires any psychiatric care, whether it be inpatient, residential or outpatient at this time." Dr. Burgoyne also stated that even if Juvenile wanted counseling, he would not benefit from it because his retention would be limited. Dr. Burgoyne therefore recommended ·Juvenile be placed in a setting with specific rules and required behavior patterns such as that found in the Arizona Department of Juvenile Corrections.

In ruling on Juvenile's disposition, the juvenile court also considered Dr. Burgoyne's report of his October 1995 evaluation of Juvenile. In the previous evaluation, Dr. Burgoyne diagnosed Juvenile as being between mildly mentally retarded and having borderline functioning abilities, and as suffering from a conduct disorder of moderate severity with an adolescent onset. *See* DSM–IV § 312.8. Dr. Burgoyne's October 24, 1995 report stated Juvenile did not require any medications because he did not suffer from a mental disorder but "has never understood nor wanted to comply with treatment recommendations or requirements of probation."

In ruling on Juvenile's disposition, the juvenile court also considered a report from Juvenile's teachers at the school he last attended which stated Juvenile was functioning academically between a kindergarten and first-grade level. The record reflects that Juvenile had changed schools numerous times because several schools could not address his needs due to his violent and uncontrollable behavior. While Juvenile had received special education services throughout his academic career, he had never been referred by either educators or his parents to the Division of Developmental Disabilities ("D.D.D.") of D.E.S. The juvenile court ordered D.D.D. to evaluate Juvenile in April 1996 pursuant to A.R.S. section 8–242. D.D.D. issued its eligibility determination in late July 1996, immediately prior to the adjudication hearing, and found Juvenile ineligible for services. Therefore, the juvenile court ordered Child Protective Services ("C.P.S."), another division of D.E.S., to assist the court in exploring possible placements for Juvenile.

The record reflects that many nonresidential treatment modalities previously had been attempted with Juvenile. He had been placed on probation but had flagrantly violated its terms. He then had been placed on intensive probation, but had run away for several months, become affiliated with gangs and abused drugs. While Juvenile's father wanted to have Juvenile in his home, the father clearly could not control Juvenile. Although Juvenile's mother was incarcerated during most of the pendency of the proceedings, she was being released on parole near the time of the disposition hearing. However, upon her release, the mother and her other three children planned to move in with Juvenile's maternal grandmother, and the grandmother had indicated she did not want Juvenile in her home due to his incorrigible behavior.

In the initial disposition hearing on July 25, 1996, the trial court discussed placement alternatives with Juvenile's C.P.S. caseworker:

> [The Court]: I don't feel comfortable just sending him [Juvenile] to one of these three [group homes in Arizona]. They haven't interviewed him, they don't know what his special needs are and they are simply saying we will take him.... I don't want to pay somebody if they don't know what needs need to be addressed.

> [C.P.S. caseworker]: Part of the packets that we sent them, we sent them Dr. Burgoyne's report, the psychologicals that were done, two by Dr. Huddleston as well as one by Dr. Parish [sic] ... Safety [one group home being considered] contacted me before they even got the reports and said they will take him.

> . . . .

> [The Court]: ... They are just looking at somebody on paper and saying this is what I see and we are willing to take him. I am not so sure they know what is needed.

> [C.P.S. caseworker]: *I would have to agree with you.*

(Emphasis added.)

Because there was not enough information available regarding potential placements for Juvenile, the juvenile court continued the disposition hearing until July 31, 1996 to allow D.E.S. to compile more information concerning placement alternatives. At the hearing, the probation officer recommended Juvenile be placed at Au Clair Palms ("Au Clair"), in Mount Dora, Florida—the placement ultimately ordered by the juvenile court—because the probation officer believed Juvenile did not need placement in a locked facility. The guardian ad litem recommended Juvenile initially be placed either at Au Clair or at a Texas secured facility which did not focus on developmentally disabled clients, and when Juvenile demonstrated improved behavior, he should be returned to Arizona.

Juvenile did not qualify for many possible placements in Arizona due to his low intelligence and poor functioning. Further, the juvenile court was convinced that those group homes in Arizona which expressed an interest in serving Juvenile would not meet his needs because they were not confined settings, and therefore he could run away. Both the probation officer and the guardian ad litem recommended Juvenile's needs would best be served by placement in a secure setting so that Juvenile could not run away. Dr. Burgoyne also recommended a secure setting, but he suggested Juvenile should be incarcerated in the juvenile correction system. However, the guardian ad litem testified it was not in Juvenile's best interest to be committed to the Arizona Department of Juvenile Corrections' Adobe Mountain School because that facility is a correctional facility which could not address Juvenile's need for instruction in adaptive living skills and because Juvenile's contact with other juveniles at that facility could impede his rehabilitation.

### III. The Placement Decision

Juvenile was already a ward of the juvenile court on July 31, 1996 when the court adjudicated him delinquent with regard to the three petitions filed against him in 1995. At

the disposition hearing, the juvenile court continued Juvenile's probation, placed him under the protective custody of a probation officer, and placed him for an indefinite period of time in the physical custody of Au Clair, a Florida-based comprehensive transition education program ("C–TEP") which specializes in providing rehabilitative services to individuals with developmental disabilities and associated behavioral challenges. Au Clair is not licensed in Arizona. Au Clair was one of the programs which the guardian ad litem and Juvenile's C.P.S. probation officer considered appropriate for Juvenile.

In accordance with A.R.S. section 8–548, the Interstate Compact on the Placement of Children, Article VI, Institutional Care of Delinquent Children, the juvenile court found that equivalent facilities for Juvenile were not available in Arizona, and institutional placement at Au Clair in Florida was in Juvenile's best interest and would not produce undue hardship. Over the objection of D.E.S., the juvenile court also ordered D.E.S. and the Maricopa County Juvenile Court to share equally in the cost of placement. On August 8, 1996, the juvenile court issued a formal order mandating that Juvenile be placed at Au Clair and that D.E.S. fund fifty percent of the placement. All parties, including D.E.S., agreed it was in Juvenile's best interest to continue the dependency determination.

D.E.S. filed a Motion for Reconsideration on August 21, 1996, requesting the court to reconsider both the placement and the order requiring D.E.S. to fund one-half of the placement costs, arguing that Au Clair constitutes a "mental health agency" as defined in A.R.S. section 8–201(17); therefore, Juvenile was entitled to the procedural safeguards of A.R.S. sections 8–242 and 36–518 prior to being placed at Au Clair. D.E.S. timely appealed both the juvenile court's disposition of Juvenile and the order that D.E.S. pay fifty percent of the placement costs. Concurrently, D.E.S. filed a motion in this court requesting authorization for the juvenile court to consider and rule on D.E.S.' Motion for Reconsideration. This court di-rected the juvenile court to consider and rule on D.E.S.' Motion for Reconsideration, suspended the appeal, and ordered that the appeal be automatically reinstated after the juvenile court ruled on the Motion for Reconsideration. The juvenile court denied the Motion for Reconsideration on September 19, 1996.

The guardian ad litem moved to enlarge the record on appeal, and D.E.S. did not object. This court granted the guardian's motion on December 6, 1996. On November 6, 1996, the juvenile court held a review of placement hearing in the delinquency matter and a pre-trial conference in the dependency matter. The court reviewed a report from Au Clair concerning Juvenile's progress in that program and ordered Juvenile to continue at Au Clair.

On January 6, 1997, the juvenile court adjudicated Juvenile dependent, making him a ward of the court, and committed him to the care, custody and control of D.E.S. At that time, neither parent contested the dependency petition. In its dependency adjudication order, the juvenile court stated Juvenile was doing very well at Au Clair and the court hoped to place Juvenile in Phoenix sometime during the year. On April 3, 1997, Juvenile was ordered placed in Phoenix at the Westbridge facility. Although Juvenile's out-of-state placement has been terminated, we consider this appeal because the question of whether D.E.S. is required to pay for one-half of the placement costs remains at issue.

## ISSUES

This appeal raises the following issues:

I. Is Au Clair, which is licensed as a comprehensive transition education program for developmentally disabled persons in Florida, a "mental health agency" as defined by A.R.S. section 8–201(17), and, if so, did the juvenile court's failure to comply with A.R.S. sections 8–242.01 and 36–518 violate Juvenile's due process rights?

II. Does the juvenile court have the authority to order D.E.S. to partially fund

the rehabilitative placement for a delinquent child who is a temporary ward of D.E.S., but who has not yet been adjudicated dependent?

## DISCUSSION

This appeal raises legal issues requiring interpretation of statutes and application of those statutes to the juvenile court's actions. *Maricopa County Juvenile Action No. JV 507879*, 181 Ariz. 246, 247, 889 P.2d 39, 40 (App.1995). Therefore, our review is *de novo. Blum v. State*, 171 Ariz. 201, 204, 829 P.2d 1247, 1250 (App.1992).

### I. Au Clair Is Not a "Mental Health Agency" and Therefore Is Not Within the Purview of A.R.S. Sections 8–242.01 and 36–518.

■ D.E.S. contends that if Au Clair were located in Arizona, it would constitute a "mental health agency," and therefore the juvenile court exceeded its jurisdiction by placing Juvenile in Au Clair as a condition of probation without complying with A.R.S. sections 8–242.01 and 36–518(C), which are intended to ensure protection of a juvenile's due process rights prior to placement in a mental health agency.

"Mental health agency" is defined by A.R.S. section 8–201(17) as:

> any private or public facility which is licensed by this state as a mental health treatment agency, a psychiatric hospital, a psychiatric unit of a general hospital or a residential treatment center for emotionally disturbed children and which utilizes secure settings or mechanical restraints.

A.R.S. section 8–242.01 governs the evaluation, treatment and placement of a mentally ill child in a mental health agency licensed by the State of Arizona. A.R.S. section 36–518 pertains to the admission of a minor to a mental health agency as defined in A.R.S. section 8–201(17).

Au Clair does not meet the criteria of a "mental health agency" under Arizona law.

Appended to D.E.S.' Motion for Reconsideration is a description of Au Clair's program for individuals with developmental disabilities that provides:

> Since its founding 30 years ago Au Clair has served individual's [sic] with developmental disabilities, including children and adults with autism and mental retardation. Though many programs serve such individuals, Au Clair specializes in treating the behavior problems sometimes associated with developmental disabilities. Problems such as ... dangerous aggression and other significant clinical challenges are addressed during placement in Au Clair's time-limited, intensive residential program. Au Clair's national reputation and record of success rests on a number of features:
>
> . . . .
>
> Educational and behavioral programming that is fully integrated into all daily activities, and provided by professional therapists who are specially trained to address the most challenging needs.

Au Clair is a private entity licensed by the State of Florida as a C–TEP pursuant to Chapter 393 (Developmental Disabilities) of the Florida Code. Fla. Stat. Ann. § 393.067 and Fla. Admin. Code Ann. § 10F–6.013. Au Clair is a locked rehabilitative treatment facility serving developmentally disabled, emotionally disturbed and mentally disturbed persons. Au Clair does not meet either the Florida or Arizona criteria to qualify as a mental health treatment facility. Section 394.455(9) of the Florida statute defines "treatment facility" as a "state-owned, state-operated, or state-supported hospital, center, or clinic designated by the department [of Health and Rehabilitative Services] for the treatment and hospitalization of persons who are mentally ill .... and also means a private facility when rendering services to a private patient." Similarly, Au Clair does not employ psychiatrists and is not licensed in either Arizona or Florida as a psychiatric facility.

Finally, Au Clair is not licensed as a residential treatment center in either Arizona or

Florida. In Florida, children's residential and day treatment programs are licensed under the Mental Health chapter of the code. Fla. Stat. Ann. § 394.67(14) (A residential treatment facility is a facility providing residential care and treatment to individuals exhibiting symptoms of mental illness who are in need of a full-time structured living environment, respite care, or long-term community placement or short-term residential treatment facilities for treatment of mental illness.). Children's residential and day treatment centers in Florida have admissions policies very similar to those of Arizona: applications and evaluations must be signed by a licensed physician and mental health professional. A.R.S. § 8–242.01; Fla. Stat. Ann. § 394.56. The record reflects Au Clair does not hold itself out as a residential treatment facility. Indeed, if Au Clair had done so, it would have violated Florida law. Fla. Stat. Ann. § 394.875(2) (stating it is unlawful for an entity to hold itself out as a residential treatment center unless it meets the statutory requirements for such a facility).

The record clearly reflects that Au Clair addresses the needs of clients with developmental disabilities who manifest behavioral challenges. Also, the record clearly reflects that Juvenile is not mentally ill, as evidenced by Dr. Burgoyne's two psychiatric evaluations; rather Juvenile suffers from mental retardation and has associated behavioral challenges. Both by its own mission statement, which is in the record, and by its license classification in Florida, Au Clair is a residential program designed to meet the needs of developmentally disabled persons who need both behavioral modification treatment and who need to develop adaptive living skills. Au Clair is licensed under chapter 393 of the Florida statutes, which pertains to developmental disabilities, and not to mental health. Fla. Stat. Ann. § 393.063(11) ("Developmental disability" means a disorder or syndrome which is attributable to retardation, cerebral palsy, autism, or spina bifida and which constitutes a substantial handicap that can reasonably be expected to continue indefinitely.).

Arizona's definition of "developmental disability" in A.R.S. section 36–551(15) is very similar to Florida's statute and provides in pertinent part:

Developmental disability [is] . . . a severe, chronic disability which . . .

(a) Is attributable to mental retardation. . . .

(b) Is manifested before age eighteen.

(c) Is likely to continue indefinitely.

(d) Results in substantial functional limitations in three or more of the following areas of major life activity:

(i) Self-care.

(ii) Receptive and expressive language.

(iii) Learning.

(iv) Mobility.

(v) Self-direction.

(vi) Capacity for independent living.

(vii) Economic self-sufficiency.

(e) Reflects the need for a combination and sequence of individually planned or coordinated special, interdisciplinary or generic care, treatment or other services which are of lifelong or extended duration.

If Au Clair were in Arizona, it most likely would be a program authorized by Arizona statutes governing services for developmentally disabled persons. Those statutes provide for the possibility of placing a developmentally disabled juvenile who is dependent in a secure facility like Au Clair; however, no funding has been made available for such a facility. A.R.S. section 36–558(C)(3)(c) provides:

The Department may provide, but not be limited to, the following programs and services in addition to other services prescribed by the director:

. . . .

(c) Community residential settings under varying degrees of supervision or a semi-independent living arrangement, including

a secure facility. Community residential settings include, subject to the availability of funding, a secure facility.

A.R.S. section 36–551(12) provides:

"Community residential setting" means a child developmental foster home, an adult developmental home, a secure setting or a residential living arrangement of any type for developmentally disabled persons operated by the department, or by a profit or non-profit agency supervised or financially supported by the department, in which developmentally disabled persons live, with appropriate supervision of the clients by the agency responsible for the operation of the residential setting.

We acknowledge that the authorization for those unfunded programs is in the statutes pertaining to developmentally disabled children, and that Juvenile was rejected by D.D.D. as ineligible. However, we also note that D.D.D.'s ineligibility determination strains credulity given the pervasive evidence in this record of Juvenile's extremely limited cognitive and functional abilities: the fact that, although Juvenile had been provided special education services for eight years, he had only been able to attain a kindergarten or first-grade reading level, and he could not recognize basic numbers.

We further note the record reflects that D.D.D.'s ineligibility determination was not challenged solely because both the guardian ad litem and the juvenile court recognized that exhausting Juvenile's administrative appeal rights with D.D.D. would significantly delay the disposition adjudication. The juvenile court expressed extreme frustration that D.E.S. did not timely evaluate Juvenile for D.D.D. services and was dilatory in exploring placement alternatives for him. Indeed, the court came perilously close to holding D.D.D. administrators in contempt for failure to comply with court orders to coordinate services for Juvenile. During the several-month delay, Juvenile languished in detention, receiving no services and therefore his rehabilitative, educational and behavioral needs were unmet.

A.R.S. section 8–242 expressly recognizes that some juveniles who are delinquent are also developmentally disabled:

A. If evidence indicates that a child who is under the jurisdiction of the court pursuant to this article may be suffering from developmental disabilities, the juvenile court shall order a study and report on the child's condition.

B. If it appears from the study and the report that such child is developmentally disabled, and the child has been adjudicated dependent, incorrigible or delinquent, the juvenile court shall hear the matter, and such child shall be assigned by the juvenile court pursuant to § 8–241. If a developmentally disabled child is assigned by the juvenile court to the department of economic security, such assignment shall be subject to the provisions of § 36–560.

We note A.R.S. section 36–501(22) expressly distinguishes persons with disorders which are psychiatric in nature, who are candidates for treatment in a mental health agency, from persons who are mentally retarded:

"Mental disorder" means a substantial disorder of the person's emotional processes, thought, cognition or memory. Mental disorder is distinguished from:

(a) Conditions which are primarily those of drug abuse, alcoholism or mental retardation, unless, in addition to one or more of these conditions, the person has a mental disorder.

Thus, the statutory method for serving developmentally disabled clients evinces an intent to distinguish between institutions serving mentally retarded patients and those serving the mentally ill who are in need of psychiatric care. Accordingly, we hold Au Clair is not a "mental health agency" as defined by A.R.S. section 8–201(17) because it is not licensed in Arizona as a psychiatric hospital or psychiatric unit of a general hospital; it is not licensed as a residential treatment center for emotionally disturbed children which utilizes secure settings or mechanical restraints; and it does

not employ psychiatrists. As a result, A.R.S. sections 8–241, 8–242.01 and 36–518 do not apply to the juvenile court's placement of Juvenile in Au Clair.

## II. Due Process

■■■ D.E.S. argues Juvenile's due process rights were violated when the juvenile court placed him at Au Clair. A condition of probation that does not violate basic fundamental rights and bears a relationship to the purpose of probation will not be disturbed on appeal. *Pima County Juvenile Action No. J–20705–3*, 133 Ariz. 296, 298, 650 P.2d 1278, 1280 (App.1982) (Juvenile court did not abuse its discretion by ordering weekend detention as a condition of probation even though A.R.S. section 8–241(A)(2)(a) did not specifically authorize juvenile court to impose conditions of probation).

The powers of the juvenile court in Arizona are limited under Article VI, section 15 of the Arizona Constitution to the powers granted by the legislature. *State v. Collins*, 122 Ariz. 550, 551, 596 P.2d 385, 386 (App.1979). The legislature has further limited the juvenile court to those dispositions specifically enumerated in A.R.S. section 8–241. *Id.* A.R.S. section 8–241(A)(2) states in pertinent part:

A. After receiving and considering the evidence on the proper disposition of the case, the court may enter judgment as follows:

. . . .

2. It may award a delinquent child:

. . . .

(d) To a private agency or institution, subject to the supervision of a probation officer.

A.R.S. section 8–241(A)(2)(b) states that the court may award a delinquent child to a probation department, *subject to such conditions as the court may impose.* (Emphasis added.) The juvenile court may impose certain conditions of probation to control a juvenile's behavior because of the need to rehabilitate the child and to protect society from further delinquent acts. A.R.S. § 8–272(E)(5) (allowing the court to impose on a juvenile under intensive probation "any other conditions . . . to meet the needs of the juvenile or to limit the risks to the community").

D.E.S. urges us to interpret A.R.S. section 8–241(A)(2) to mean that when a juvenile court must place a delinquent child who is also a dependent child in need of rehabilitation services, it cannot place the child out-of-state, even when there are no appropriate in-state placement alternatives. The term "private agency or institution" is not defined in the statute or elsewhere in the Arizona Juvenile Court Code. We hold A.R.S. section 8–241(A)(2)(d) affords the juvenile court the latitude to order a juvenile who has been adjudicated delinquent and dependent to be placed in an out-of-state private agency or institution when an appropriate placement is unavailable in Arizona. The statute has no limitation · that such a "private agency or institution" be located in Arizona, and we will not infer such a requirement.

■■■ Of course, if there is an available appropriate placement in Arizona for a juvenile, the juvenile court should order the juvenile placed in this state. However, in this case, sufficient evidence supports the juvenile court's finding that an appropriate placement in Arizona was not available. Here, the system for providing services to developmentally disabled persons did not work correctly. When the juvenile court ordered D.E.S. to explore placement alternatives for Juvenile, D.D.D. should have accepted Juvenile for services and found him a suitable placement, either in Arizona or out-of-state. Unfortunately, that did not happen. Instead, D.D.D. found Juvenile ineligible for its services, and the court re-assigned the case to C.P.S.

After thoroughly discussing the placement alternatives with all concerned, including the C.P.S. caseworker, the juvenile court then determined an appropriate placement for Juvenile. Because Arizona did not have an available appropriate placement for Juvenile, the juvenile court was forced to place Juvenile out-of-state. The court, the guardian ad

litem and the probation officer all recognized Juvenile did not belong in a correctional facility, but rather required services to address his developmental disabilities and associated behavioral challenges. Clearly, Juvenile's placement in Au Clair was reasonably related to the terms of his probation and to the goal of rehabilitating him.

The record reflects that Juvenile had not succeeded in any alternative placement less restrictive than a secured setting. D.E.S. and Juvenile himself urged that he be incarcerated in the juvenile corrections system. The court determined a correctional secured facility would not meet Juvenile's needs; rather, he needed a setting that would address his functional needs. Ordering Juvenile placed on a short-term basis at Au Clair addressed those needs, as evidenced by Juvenile's success in that program and his ability to make the transition to an Arizona program. The juvenile court made every effort to meet Juvenile's needs, and therefore, we hold the placement at Au Clair did not violate Juvenile's due process rights.

### III. The Juvenile Court Had the Authority to Order D.E.S. to Share the Cost of the Au Clair Placement

■ D.E.S. maintains the juvenile court exceeded its jurisdiction when it ordered D.E.S. to pay one-half of the cost of Juvenile's placement at Au Clair. We note that C.P.S.' administrators filed an Addendum Report with the juvenile court on July 17, 1996 which was appended to D.E.S.' Motion for Reconsideration. In that report, the C.P.S. caseworker stated he had explored several possible group home placements for Juvenile but "It remains the opinion of this case manager that [Juvenile] will have difficulty succeeding in any placement which might be available to him.... It is respectfully recommended that [Juvenile] be made a Ward of the Court, committed to the care, custody and control of the Arizona Department of Economic Security. It is further ... recommended that the Court order the cost of any placement located for [Juvenile] *be equally shared by the Arizona Department of Economic Security and the Maricopa County Department of Probation, Juvenile Division.*" (Emphasis added.)

The juvenile court followed the C.P.S. caseworker's recommendation and ordered D.E.S. to fund one-half of Juvenile's placement costs. Ironically, C.P.S. now requests this court to rule that the juvenile court exceeded its jurisdiction when it accepted C.P.S.' recommendation that C.P.S. fund one-half of the placement costs. D.E.S. has waived this issue.

■ However, even if the issue were not waived, we note that once Juvenile was made a temporary ward of the State, the State became responsible for providing the supervision and placement of Juvenile. A.R.S. §§ 46–134, 46–291 to –297. The juvenile court can order D.E.S. to be responsible for the supervision of a temporary ward. *Maricopa County Juvenile Action No. JD–05401,* 173 Ariz. 634, 640, 845 P.2d 1129, 1135 (App. 1993). D.E.S. must pay the costs associated with providing necessary supervision, subject to reimbursement by Juvenile's parents. A.R.S. §§ 46–134(A)(2), 46–291(A) and 8–241(B). Section 46–134(A)(2)(c)(i) states that D.E.S. shall administer child welfare activities, including providing the cost for care of children who are adjudicated dependent and who are in institutions, except state institutions. Clearly, Au Clair is an "institution" where Juvenile has been placed.

The juvenile court, faced with no in-state placement alternatives appropriate for Juvenile, ruled that Juvenile be placed on a short-term basis at Au Clair, and that as soon as he succeeded in modifying his behavior, he make the transfer to a less restrictive placement in Arizona. Indeed, Juvenile did succeed at Au Clair and was relocated to Arizona approximately five-and-one-half months after being placed at Au Clair.

■ D.E.S. also maintains the court could have placed Juvenile in-state at one of the group homes that the court considered or at Adobe Mountain. A juvenile court's disposition of a juvenile delinquent will not be

disturbed except for an abuse of discretion. *Juvenile Action No. JV–128676*, 177 Ariz. 352, 353, 868 P.2d 365, 366 (App.1994). The welfare of·the child is the prime consideration of the juvenile code. *Pima County Juvenile Action No. J–31853*, 18 Ariz.App. 219, 220, 501 P.2d 395, 396 (1972). The main objective of the juvenile court system is the protection and rehabilitation of the juvenile. A juvenile court may impose any condition to meet a juvenile's needs or limit community risks. *Navajo County Juvenile Action No. 92–J–040*, 180 Ariz. 562, 563, 885 P.2d 1127, 1128 (App.1994). We hold that the juvenile court's placement of Juvenile at Au Clair as a condition of probation finds solid support in the record and did not constitute an abuse of discretion.

D.E.S. must assist other departments of the State, cooperate with the juvenile court in delinquency cases and other related matters, and expend monies in fulfilling those duties. A.R.S. §§ 46–134(A)(5),(8), and (10). Here, the juvenile court ordered C.P.S. to identify appropriate placements for Juvenile. A number of possible placements were identified, including Au Clair. The juvenile court selected Au Clair as the program most appropriate for meeting Juvenile's needs and sufficient evidence exists in the record to support that order. We therefore hold the juvenile court did not abuse its discretion in ordering D.E.S. to pay one-half of the cost of the placement at Au Clair.

### CONCLUSION

The juvenile court acted within its authority in placing the delinquent Juvenile in the protective custody of the Department of Probation and in the physical custody of Au Clair. The court also properly ordered D.E.S. to share the cost of Juvenile's placement in Au Clair with the Probation Department. Therefore, we affirm.

EHRLICH, P.J., and WEISBERG, J., concur.