NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

IN RE TERMINATION OF PARENTAL RIGHTS AS TO R.G., A.G., and
F.G.

No. 1 CA-JV 24-0135

FILED 07-22-2025

---

Appeal from the Superior Court in Maricopa County
No. JD42114
The Honorable Adele G. Ponce, Judge

**AFFIRMED**

---

COUNSEL

David W. Bell Attorney at Law, Higley
By David W. Bell
*Counsel for Appellant*

Arizona Attorney General's Office, Tucson
By Jennifer L. Thorson
*Counsel for Appellee*

---

**MEMORANDUM DECISION**

Judge Cynthia J. Bailey delivered the decision of the Court, in which
Presiding Judge Jennifer M. Perkins and Vice Chief Judge David D.
Weinzweig joined.

---

**B A I L E Y**, Judge:

**¶1**        Prince G. ("Father") appeals the superior court's order terminating his parental rights to his three children.  For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

**¶2**        We view the facts in the light most favorable to upholding the superior court's order.  *Ariz. Dep't of Econ. Sec. v. Matthew L.*, 223 Ariz. 547, 549, ¶ 7 (App. 2010).

**¶3**        Father and Brittany G. ("Mother") are the biological parents of three children: R.G., A.G., and F.G., born in 2018, 2019, and 2022, respectively (collectively, "the children").  Mother is not a party to this appeal.

**¶4**        In May 2022, the Department of Child Safety ("DCS") received a report that Mother placed R.G.'s arm under hot water because she saw a demon and wanted to "wash[] it off."  R.G. sustained second-degree burns.  Father reported the incident to the Tempe police department the next day but refused to seek medical attention.

**¶5**        Three months later, DCS received reports that Father suffers from mental illness and "believes the government is recording him and that people are being cloned."  The reports indicated Father also believes the government has placed a microchip in R.G.'s and Father's ears.  DCS filed a dependency petition alleging Father could not properly care for the children because of his mental health issues and removed them from his custody.

**¶6**        In a November 2022 psychological evaluation, Father was diagnosed with delusional disorder, persecutory type.  The evaluator recommended Father participate in individual counseling and enroll in a parenting skills program.

**¶7**        Father attended counseling sessions from April 2023 until May 2024, when Father asked the counselor "not to contact him any [further.]"  Throughout his counseling, Father expressed concerns that his employers were "motivated, or convinced, or blackmailed . . . by the government to sabotage his employment" and that "the maternal grandmother was killed and cloned."  He also was suspicious that the government is "surveilling him via people dressed in fatigues in particular, to shining or firing lasers at him, which make him weak, or tired, or sleepy."

And, despite R.G.'s autism diagnosis, Father was convinced that the children's developmental delays are caused by microchips the government implanted in their brains.

**¶8**     The counselor discussed Father's diagnosis with him, and although Father "admitted [that] he believed some people do have this disorder. He doesn't seem to think that he does." Moreover, the counselor testified that Father showed no improvement in his symptoms following counseling.

**¶9**     In October 2023, after a psychiatric evaluation, Father was diagnosed with paranoid psychosis. He became angry when he was recommended medication and began yelling that "the government had [the doctor] under [its] control." The evaluating doctor opined that although Father would benefit from a trial of medications, his refusal to take them would likely cause his condition to decline.

**¶10**     In December 2023, DCS moved to terminate Father's parental rights on fifteen-month out-of-home placement and mental health grounds, and the superior court changed the case plan to termination and adoption. *See* Ariz. Rev. Stat. ("A.R.S.") § 8-533(B)(3), (8)(c). The superior court held a hearing and terminated Father's parental rights on both grounds.

**¶11**     Father timely appealed. We have jurisdiction under A.R.S. §§ 8-235(A), 12-120.21(A)(1), and 12-2101(A)(1).

## DISCUSSION

**¶12**     To terminate parental rights, the superior court must find both a statutory ground under A.R.S. § 8-533(B) by clear and convincing evidence, and that termination is in the children's best interests by a preponderance of the evidence. *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 149–50, ¶ 8 (2018).

**¶13**     We review the superior court's parental rights termination order for an abuse of discretion. *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8 (App. 2004). Because the superior court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts," we will affirm an order terminating parental rights if supported by reasonable evidence. *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18 (App. 2009) (citations omitted).

I.       Fifteen-Month Out-of-Home Placement Ground

¶14       The superior court may terminate parental rights under the fifteen-month out-of-home placement ground if it finds by clear and convincing evidence that (1) the children have been in an out-of-home placement for at least fifteen months; (2) DCS has made a diligent effort to provide appropriate reunification services; (3) the parent has been unable to remedy the circumstances that caused the out-of-home placement; and (4) "there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future." A.R.S. § 8-533(B)(8)(c). The "circumstances" are those "existing at the time of the severance that prevent a parent from being able to appropriately provide for his or her children." *Jordan C.*, 223 Ariz. at 96, ¶ 31 n.14 (citation modified).

¶15       Father does not contest the superior court's findings on the first three factors but contends no reasonable evidence supports finding that he is unable to sufficiently provide appropriate parenting either now or in the near future. "Proper and effective parental care and control" is a context-specific term. *See Joelle M. v. Dep't of Child Safety*, 245 Ariz. 525, 527–28, ¶¶ 12–13 (App. 2018); *Pima Cnty. Juv. Action No. J-31853*, 18 Ariz. App. 219, 222 (1972). The court must "consider the discrete and special needs of the particular child, both to protect the child's best interest and meaningfully assess the parent's willingness and ability to provide proper and effective parental care and control for that child." *Joelle M.*, 245 Ariz. at 527, ¶ 12 (citation omitted). A parent's mental health diagnosis may render a parent incapable of exercising proper and effective parental care and control if the court determines the mental illness has "a seriously adverse effect upon the child" given the child's needs. *J-31853*, 18 Ariz. App. at 223 (citation omitted).

¶16       Here, ample evidence supports the court's finding that Father is unable to provide proper and effective parental care and control. R.G. completed a psychological evaluation, was diagnosed with autism, and was referred to several programs, including speech and behavioral therapy. Still, Father believes R.G.'s developmental delays result from a microchip "the government" implanted in his head, a theory Father has shared with R.G. Father likewise believes that the other children's behaviors "are being influenced by the government" through microchips implanted in their heads.

¶17       The court heard testimony that Father's delusional disorder impedes his ability to exercise care and control over the children. Because

4

of Father's belief that the government controls his and his children's behaviors, Father's counselor testified that Father's delusions could cause him to discontinue or withhold necessary medical treatment for the children while also subjecting them to medically unnecessary procedures. Father stated that he "plans on getting the children MRI's [sic] so he can see the government technology inserted in their bodies." And, Father was invited to participate in R.G.'s occupational and speech therapies but declined citing a "conspiracy" against him. The counselor expressed concern that Father would discontinue R.G.'s therapies because he disbelieved R.G.'s autism diagnosis. And the counselor testified it would harm R.G. to discontinue the prescribed autism therapies, as early intervention gives R.G. "[the] best chance of success."

¶18        Father also believes A.G. was sexually assaulted while in maternal grandmother's care. But when a doctor examined A.G., he found no signs of sexual assault. Father disagreed with that conclusion, maintained that there "is male DNA still inside [A.G.]," and left with A.G. before the appointment was over and against medical advice.

¶19        Father's attempts to direct us to more favorable evidence for his position, such as his completion of the Nurturing Parent Program; his participation in supervised visits; his relationship with the children; and his ability to provide food, shelter and clothing are unavailing. Although Father's participation in—even completion of—services is admirable, the service providers each raised concern about Father's mental health. For example, DCS received several reports from the supervised visitation agency that Father needed to be redirected away from talking about his delusions with the children. And, at a recent visit, Father shared with R.G. a photo that caused him to scream, "Mommy burned me."

¶20        The superior court heard this evidence and found that Father was unable to provide proper and effective parental care and control. We will not reweigh the evidence or redetermine the credibility of witnesses on appeal. *See Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 282, ¶ 12 (App. 2002).

¶21        Reasonable evidence supports the court's finding that Father is unable to properly and effectively exercise parental care and control. Because we affirm the court's order based on the fifteen-month ground, we do not address the mental health ground. *See id.* at 280, ¶ 3.

II.     Best Interests

¶22     Father also argues the superior court erred in finding that termination of his parental rights was in the children's best interests. Termination is in the children's best interests if they will benefit from termination or be harmed if termination is denied. *Alma S.*, 245 Ariz. at 150, ¶ 13.  The court may find a child would benefit from termination if an adoption plan existed or if the child is adoptable. *Id.*  The court may also find that a child will benefit from the permanency and stability an adoption would provide. *See Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 337, ¶ 16 (App. 2004); *Maricopa Cnty. Juv. Action No. JS-501904*, 180 Ariz. 348, 352 (App. 1994).  Conversely, the court may find termination of the parent-child relationship is in the child's best interests if continuing the relationship would harm the child. *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 4, ¶ 16 (2016).

¶23     The superior court found the current placement was willing to adopt all three children and could provide them a stable home where their needs were met.  Father argues the court "did not put sufficient emphasis on the bonded, positive relationship he has with his children or properly recognize the damage that can be done to the children emotionally if they are forever deprived of an ongoing relationship with their Father."  Father's argument is a request to reweigh the evidence, which we will not do. *See Jesus M.*, 203 Ariz. at 282, ¶ 12.  Reasonable evidence supports the court's determination that the children would benefit from termination.

**CONCLUSION**

¶24     We affirm.



MATTHEW J. MARTIN • Clerk of the Court
**FILED**:          JR

6