IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

**JESSIE D.**,
*Appellant*,

*v.*

**DEPARTMENT OF CHILD SAFETY, F.V.**, **M.D.**, **M.D.**, **C.D.**,
*Appellees*.

No. CV-19-0321-PR
Filed October 8, 2021

Appeal from the Superior Court in Maricopa County
The Honorable Joseph C. Kreamer, Judge
No. JD34609
**AFFIRMED**

Memorandum Decision of the Court of Appeals, Division One
No. 1 CA-JV 19-0073
Filed November 14, 2019
**AFFIRMED**

COUNSEL:

Thomas A. Vierling (argued), Vierling Law Offices, Phoenix, Attorney for
Jessie D.

Mark Brnovich, Arizona Attorney General, Drew C. Ensign, Section Chief
Counsel, Civil Appeals Section, Dawn R. Williams (argued), Toni M.
Valadez, Sandra L. Nahigian, Assistant Attorneys General, Phoenix,
Attorneys for Department of Child Safety

_____

JUSTICE BEENE authored the Opinion of the Court, in which CHIEF JUSTICE BRUTINEL, VICE CHIEF JUSTICE TIMMER, JUSTICE LOPEZ, and JUDGE STARING* joined.** JUSTICE BOLICK concurred in part and in the judgment.

_____

JUSTICE BEENE, Opinion of the Court:

¶1        Under A.R.S. § 8-533(B)(4), a court may terminate a parent-child relationship if the parent is convicted of a felony and the resulting prison sentence "is of such length that the child will be deprived of a normal home for a period of years." In *Michael J. v. Arizona Department of Economic Security*, 196 Ariz. 246, 251–52 ¶ 29 (2000), we set forth the relevant factors a juvenile court should consider in making this determination. Those factors include, but are not limited to:

> (1) the length and strength of any parent-child relationship existing when incarceration begins, (2) the degree to which the parent-child relationship can be continued and nurtured during the incarceration, (3) the age of the child and the relationship between the child's age and the likelihood that incarceration will deprive the child of a normal home, (4) the length of the sentence, (5) the availability of another parent to provide a normal home life, and (6) the effect of the deprivation of a parental presence on the child at issue.

_____

*        Justice William G. Montgomery has recused himself from this case. Pursuant to article 6, section 3 of the Arizona Constitution, the Honorable Christopher P. Staring, Judge of the Arizona Court of Appeals, Division Two, was designated to sit in this matter.

**        Although Justice Andrew W. Gould (Ret.) participated in the oral argument in this case, he retired before issuance of this Opinion and did not take part in its drafting.

*Id.* These have come to be known as the "*Michael J.* factors."

**¶2**   Although the juvenile court misapplied two *Michael J.* factors in this case, substantial evidence exists to support termination. Accordingly, we affirm the court's order terminating the parent-child relationship.

**BACKGROUND**

**¶3**   Jessie D. ("Father") and Joana V. ("Mother") had four children together. In August 2016, while Father was living with Mother and the children, their house caught fire, and they became homeless. Mother and the children moved into a homeless shelter, but Father was not permitted to live there due to an outstanding warrant. In December, Father was arrested, and in July 2017, he was convicted of two counts of aggravated driving under the influence and sentenced to seven years' incarceration with a maximum release date of December 2022. At the time of his incarceration, the children ranged in age from 1.5 to 7 years old.

**¶4**   In August 2017, the Department of Child Safety ("DCS") removed the children from Mother's care because of homelessness, domestic violence, and substance-abuse issues. A month later, the court found the children dependent as to Father.

**¶5**   In June 2018, DCS moved to terminate Father's parental rights to the children under § 8-533(B)(4).[1] The juvenile court held a termination hearing in November, during which the DCS case manager and Father testified. Following the hearing, the court found by clear and convincing evidence that Father's sentence was of sufficient length to deprive the children of a normal home for a period of years. The court further found that DCS had shown by a preponderance of the evidence that termination of Father's parental rights would be in the children's best interests. Accordingly, the juvenile court terminated Father's rights to the children.

---

[1]   Mother's parental rights have been terminated and she is not a party to this appeal.

**¶6**        Father appealed.  The court of appeals affirmed the juvenile court's termination.  *Jessie D. v. Dep't of Child Safety*, No. 1 CA-JV 19-0073, 2019 WL 6003238, at *1 ¶ 1 (Ariz. App. Nov. 14, 2019) (mem. decision).  In conducting its review, the court of appeals analyzed the juvenile court's application of the *Michael J.* factors.  *Id.* at *2–3 ¶¶ 6–16.  It found that reasonable evidence supported each finding and concluded that the court did not abuse its discretion in evaluating the factors.  *Id.* at *3 ¶ 14.  The court also concluded that reasonable evidence supported the juvenile court's finding that severance was in the children's best interests.  *Id.* at ¶ 19.

**¶7**        We granted review on the following issues: (1) whether substantial evidence exists in the record to support the juvenile court's finding that Father's conviction and length of sentence of imprisonment was of such a length as to deprive the children of a normal home for a period of years, and (2) whether substantial evidence exists in the record to support the juvenile court's finding that termination of Father's parental rights would be in the children's best interests.  We have jurisdiction pursuant to article 6, section 5(3) of the Arizona Constitution.

**DISCUSSION**

**¶8**        Parents enjoy a fundamental liberty interest in "the care, custody, and management" of their children.  *Santosky v. Kramer*, 455 U.S. 745, 753 (1982).  But this right is not inalienable.  *See, e.g., In re Appeal in Maricopa Cnty. Juv. Action No. JD-561*, 131 Ariz. 25, 27–28 (1981) ("The state has a vital interest in the status of the parent-child relationship and, because of the importance of this interest, the state may intrude into the parent-child relationship to protect the welfare of the child and the state's own interest in the welfare of its citizens.").  A court may terminate "parental rights under certain circumstances, so long as the parents whose rights are to be severed are provided with 'fundamentally fair procedures' that satisfy due process requirements."  *Kent K. v. Bobby M.*, 210 Ariz. 279, 284 ¶ 24 (2005) (quoting *Santosky*, 455 U.S. at 754).  "Arizona's severance statute satisfies due process because the statutory grounds are 'synonymous with parental unfitness.'"  *Jessica P. v. Dep't of Child Safety*, 249 Ariz. 461, 470 ¶ 31 (App. 2020) (quoting *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 150 ¶ 9 (2018)), *vacated on other grounds by Jessica P. v. Dep't of Child Safety*, CV-20-0241-PR, 2020 WL 8766053, at *1 (Ariz. Dec. 15, 2020).  In Arizona, "[t]o justify

4

termination of the parent-child relationship, the [juvenile] court must find, by clear and convincing evidence, at least one of the statutory grounds set out in section 8-533, and also that termination is in the best interest of the child." *Michael J.*, 196 Ariz. at 249 ¶ 12.

¶9 As previously indicated, under § 8-533(B)(4), a juvenile court may terminate the parent-child relationship if the parent is convicted of a felony and "the sentence of that parent is of such length that the child will be deprived of a normal home for a period of years." "The 'normal home' . . . relates to [Father's] obligation to provide a normal home, a home in which the . . . father has a presence, and it does not refer to a 'normal home' environment created by [others]." *In re Appeal in Maricopa Cnty. Juv. Action No. JS-5609*, 149 Ariz. 573, 575 (App. 1986). There is "no 'bright line' definition of when a sentence is sufficiently long to deprive a child of a normal home for a period of years." *Michael J.*, 196 Ariz. at 251 ¶ 29. Rather, the inquiry is individualized and fact specific. The juvenile court must consider "all relevant factors," including the previously mentioned *Michael J.* factors. *Id.* at 251–52 ¶ 29. Termination, however, may be appropriate even if some of the *Michael J.* factors do not support the severance of parental rights. Indeed, "[a] lack of evidence on one or several of the *Michael J.* factors may or may not require reversal or remand on a severance order." *Christy C. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 445, 450 ¶ 15 (App. 2007).

¶10 We review the court's termination decision for an abuse of discretion and will affirm unless no reasonable evidence supports the court's findings. *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47 ¶ 8 (App. 2004). "Because the juvenile court is in the best position to weigh evidence and assess witness credibility, we accept the juvenile court's findings of fact if reasonable evidence and inferences support them, and will affirm a severance order unless it is clearly erroneous." *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 3 ¶ 9 (2016). However, "we review de novo legal issues requiring the interpretation and application of § 8-533." *Ariz. Dep't of Econ. Sec. v. Rocky J.*, 234 Ariz. 437, 440 ¶ 12 (App. 2014).

**I.**

¶11        The first *Michael J.* factor requires a juvenile court to consider "the length and strength of any parent-child relationship existing when incarceration begins." *Michael J.*, 196 Ariz. at 251–52 ¶ 29.   When considering the temporal aspect of this factor, the court should take into account the time the parent and child had spent together before incarceration.   Additionally, when evaluating the stability of the parent-child relationship, the court should consider whether the parent cared for the child, both physically and financially, and whether the parent resided with the child or regularly visited the child if they did not live together.

¶12        Here, the juvenile court found that the evidence regarding this factor was "limited and conflicting," but concluded that "the relationship was not particularly strong."   The court based its decision on the following evidence: (1) Father did not live with the children before his incarceration; (2) Father's description of his relationship with the children before he was incarcerated — taking them to the park, building things with them, and teaching them to draw — suggested that Father was not the "primary caretaker" for the children; (3) Father was absent for a large portion of the lives of two of his children because of incarceration; and (4) the children's apparent lack of interest in their Father since being placed in DCS's care.   While we agree with the juvenile court that the evidence regarding this factor was "limited and conflicting" — particularly based on the differing testimony regarding the parent-child bond from Father and the DCS case manager — we conclude that the court misapplied this *Michael J.* factor.

¶13        Although the juvenile court considered the amount of time Father spent with the children before his incarceration and discussed the strength of their relationship, it reasoned that the first *Michael J.* factor was not established because Father "was not a primary caretaker for these children."   *Michael J.* does not mandate, and we have never held, that the length and strength of the parent-child relationship hinges on a parent's "primary caretaker" status.   A finding that a parent is not the "primary caretaker" does not necessarily mean the parent did not also care for, or establish a bond with, a child.   Further, the court incorrectly faulted Father

for not "actually living with the children" when Father testified that he was not permitted to stay in the homeless shelter with his family, so he slept outside the shelter in his car. The court also wrongly faulted Father for having six other children, which the court found limited Father's time to build relationships with the children at issue here. Parents with a large number of children can still form bonds with those children. Because it is not clear from the court's order that it properly considered the length and strength of the relationship between Father and the children, it misapplied the first *Michael J.* factor.

¶14 The second *Michael J.* factor addresses "the degree to which the parent-child relationship can be continued and nurtured during the incarceration." *Id.* at 252 ¶ 29. In addressing this factor, the juvenile court should "consider not only the parent-child relationship at the time the incarceration commences but also, how and whether that relationship may be maintained during the incarceration." *Jeffrey P. v. Dep't of Child Safety*, 239 Ariz. 212, 215 ¶ 13 (App. 2016).

¶15 Here, the juvenile court found:

> [T]he parent-child relationship cannot be meaningfully continued while [F]ather is incarcerated. All four children are very young. . . . The frequent, meaningful contact required for a parent to build and maintain a bond is virtually, if not completely, impossible in a prison setting. Father cannot interact with the children in a home, school or recreational setting. . . . He cannot observe them with friends or in a social setting. He cannot reasonably parent.

¶16 We conclude that the juvenile court misapplied this *Michael J.* factor. The focus of the court's inquiry should be "how and whether" a parental relationship can be maintained during Father's incarceration. *Id.* But the court concluded that the factor was not met because Father was unable to interact with the children in more traditional settings (i.e., home, school, and recreational). While the court is correct that Father will be unable to parent in the conventional manner while incarcerated, its analysis failed to address whether Father's relationship with the children could be

maintained while he was in prison. For this reason, the juvenile court misapplied the second *Michael J.* factor.

¶17 The juvenile court's rationale and conclusion regarding this factor renders it self-fulfilling and implies that incarcerated parents could never adequately maintain a parent-child relationship with their young children. This implication is contrary to law. As previously stated, maintaining a relationship with one's children while incarcerated would undoubtedly be a difficult task, but an incarcerated parent can maintain a bond with a child in other ways, such as through visits, phone calls, letters, pictures, and gifts. *See Michael J.*, 196 Ariz. at 251 ¶ 24. And it is crucial to remember that parents' right to the custody and control of their children is fundamental and "does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." *Santosky*, 455 U.S. at 753.

¶18 Although § 8-533(B)(4) does not impose an explicit duty on DCS to provide reunification services, the absence of a statutory duty does not obviate the state's obligation to provide these services. Arizona courts have previously recognized a requirement to engage in reunification efforts "on constitutional grounds as a necessary element of any state attempt to overcome . . . the 'fundamental liberty interest of the natural parents in the care, custody and management of their child.'" *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192 ¶ 32 (App. 1999) (quoting *Santosky*, 455 U.S. at 753). Providing reunification services is imperative in severance proceedings because "[t]he combined effect of the fundamental character of a parent's right to his child and the severity and permanence of termination dictates that the court sever the parent-child relationship only in the most extraordinary circumstances, *when all other efforts to preserve the relationship have failed.*" *In re Appeal in Maricopa Cnty. Juv. Action No. JA 33794*, 171 Ariz. 90, 91–92 (App. 1991) (emphasis added).

¶19 Here, the juvenile court correctly relied on existing precedent when it concluded that DCS was not required to provide reunification services to Father. *See James H. v. Ariz. Dep't of Econ. Sec.*, 210 Ariz. 1, 2 ¶ 6 (App. 2005). However, the rationale for denying incarcerated parents reunification services as expressed in *James H.* is not persuasive. In that

case, the court of appeals concluded that in the "case of a lengthy prison sentence . . . reunification efforts were not required because prolonged incarceration is something neither [DCS] nor the parent could ameliorate through reunification services." *Id.* at 3 ¶ 9.

**¶20** *James H.*'s categorical refusal to provide reunification services to parents serving lengthy sentences is contrary to the well-settled axiom that "severance of the parent-child relationship should be resorted to 'only when concerted effort to preserve the relationship fails.'" *In re Appeal in Maricopa Cnty. Juv. Action No. JS-5209 & No. JS-4963*, 143 Ariz. 178, 189 (App. 1984) (quoting *In re Appeal in Maricopa Cnty. Juv. Action No. S-111*, 25 Ariz. App. 380, 387 (1975), *overruled on other grounds by In re Appeal in Yavapai Cnty. Juv. Action No. J-8545*, 140 Ariz. 10, 14 (1984)). Because parents incarcerated for a lengthy period still possess a fundamental liberty interest in the care, custody, and management of their children, *Troxel v. Granville*, 530 U.S. 57, 65 (2000), DCS must make diligent efforts to preserve the family by providing services to assist parents in maintaining a bond with their children.

**¶21** We are mindful that requiring DCS to provide reunification services to an incarcerated parent is a departure from prior Arizona law, although it is a constitutional requirement under *Santosky*. If DCS seeks to terminate parental rights under § 8-533(B)(4)'s provision addressing the parent's length of felony sentence, and an incarcerated parent requests reunification services, such as visitation, and providing the services will not endanger the child, DCS must make reasonable efforts to provide these services. DCS's obligation to provide services to an incarcerated parent is not without limits. It must, however, initiate measures designed to address an incarcerated parent's desire to maintain a parent-child relationship. At bottom, incarceration does not automatically render a parent unfit and DCS "has a responsibility to assist parents, incarcerated or not, who face termination of their rights." *Michael J.*, 196 Ariz. at 253 ¶ 38 (Zlaket, C.J., concurring in part and dissenting in part).

**¶22** The juvenile court correctly analyzed and applied the remaining *Michael J.* factors. On the third factor—the age of the child and the relationship between the child's age and the likelihood that

incarceration will deprive the child of a normal home—reasonable evidence supported the court's conclusion that given the children's ages, 1.5 to 7 years old, it was "virtually impossible to maintain anything approaching a normal parent-child relationship." On the fourth factor—length of sentence—the court correctly considered the total length of Father's sentence, including time to complete parent aide services, and found that a realistic reunification date would be "mid to late 2023 at the earliest." This finding was supported by exhibits and testimony taken during the hearing. On the fifth factor—the availability of another parent to provide a normal life—the court properly concluded that another parent is not available because Mother's rights had been terminated. On the sixth factor—the effect of deprivation of a parental presence—the court appropriately found, based on the testimony provided at the hearing, that the children would "essentially be left adrift if Father's rights are not severed."

¶23 Although there was conflicting evidence offered at the termination hearing, we do not reweigh the evidence because the court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts." *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334 ¶ 4 (App. 2004). Father asserts that the juvenile court abused its discretion in terminating his parental rights because he was not afforded sufficient time to reunify with the children and was not provided visitation services. The record belies this claim. Father intermittently requested visitation with his children and the court directed DCS to follow up on Father's request, but he also stated at three separate hearings that he had "no objection" to the court's finding that DCS had "offered, made referrals, provided, and/or requested" transportation and visitation services for him and the children.

¶24 Notably, Father sent letters to the children and engaged in phone calls that DCS's psychologist determined were inappropriate based on the substance of the conversations and the children's undesirable behaviors after communicating with Father. As a result, DCS determined that providing Father's letters to the children or allowing them to engage in phone calls was not in their best interests. Although DCS should have informed Father about its decision not to forward his letters or allow phone calls with the children so he could have challenged this decision, or written

additional letters that did not discuss the topics DCS found inappropriate, this omission did not affect the propriety of the court's decision to sever Father's parental rights given the totality of the record.

¶25 Here, the juvenile court did not abuse its discretion in determining that Father's sentence was of such length to deprive the children of a normal home for a period of years.

**II.**

¶26 Once the juvenile court finds by clear and convincing evidence that a statutory ground for termination exists, the court must then determine by a preponderance of the evidence whether severance is in the child's best interests. *Alma S.*, 245 Ariz. at 149–50 ¶ 8. Here, Father contends that there was "insufficient evidence" to support the court's best-interests finding. We disagree.

¶27 In a best-interests inquiry, "we can presume that the interests of the parent and child diverge because the court has already found the existence of one of the statutory grounds for termination by clear and convincing evidence." *Id.* at 150 ¶ 12 (quoting *Kent K.*, 210 Ariz. at 286 ¶ 35). Accordingly, after the court finds "that a parent is unfit, the focus shifts to the interests of the child as distinct from those of the parent," and the "child's interest in stability and security" becomes the court's foremost concern. *Id.* (first quoting *Kent K.*, 210 Ariz. at 285 ¶ 31; and then quoting *Demetrius L.*, 239 Ariz. at 4 ¶ 15). Termination of a parent's rights "is in the child's best interests if either: (1) the child will benefit from severance; or (2) the child will be harmed if severance is denied." *Id.* at ¶ 13. Among the factors that the court may consider when making this determination are whether: "1) an adoptive placement is immediately available; 2) the existing placement is meeting the needs of the child[ren]; and 3) the children are adoptable." *Raymond F. v. Ariz. Dep't of Econ. Sec.*, 224 Ariz. 373, 379 ¶ 30 (App. 2010) (internal citations omitted).

¶28 Here, the juvenile court found that the children were placed with a family that is willing to adopt. Additionally, the court determined that the children would benefit from termination because their adoption

would allow them to remain together in "a stable, loving environment, and would be able to achieve permanency." The court went on to conclude that maintaining the parent-child relationship would be harmful to the children because the length of Father's imprisonment would impede the possibility of maintaining a normal parent-child relationship.

¶29 Viewing the record in the light most favorable to upholding the court's best-interests finding, *Demetrius L.*, 239 Ariz. at 2 ¶ 2, and applying our deferential standard of review, *id.* at 3 ¶ 9, we conclude that reasonable evidence supports the juvenile court's best-interests finding.

## CONCLUSION

¶30 Because reasonable evidence supports the juvenile court's findings, we affirm the court's order terminating Father's parental rights.

BOLICK, J., concurring in part and in the judgment:

**¶31** I cannot join the opinion in full as I disagree that Arizona's termination of parental rights statute, as applied by this Court's rules and opinions, satisfies due process requirements. *Supra* ¶ 8. To the contrary, it falls far short, often depriving parents of their fundamental rights. *See, e.g.*, *Trisha A. v. Dep't of Child Safety*, 247 Ariz. 84, 92–95 ¶¶ 33–48, 100 ¶ 73 (2019) (Bolick, J., dissenting) ("[T]he process our state has constructed creates the very real prospect that parents will lose their children not because they deserve to, but because they are unable to effectively defend their rights in a system that is stacked hopelessly against them."); *Alma S.*, 245 Ariz. at 154–55 ¶¶ 30–36 (Bolick, J., concurring in the result); *Brenda D. v. Dep't of Child Safety*, 243 Ariz. 437, 450 ¶ 48 (2018) (Timmer, J., dissenting in part and concurring in part); *Marianne N. v. Dep't of Child Safety*, 243 Ariz. 53, 59 ¶ 33 (2017) (Eckerstrom, J., dissenting).

**¶32** The outcome in this case is harsh but not unwarranted. The father strove mightily to preserve a relationship with his children, even apparently sleeping in his car outside a homeless shelter after the family home burned down in order to remain close to his children. Even while incarcerated, he tried to maintain communication with his children, although it appears that DCS failed to fulfill its constitutional obligation to facilitate such contact. But when a parent commits a felony and is sentenced to lengthy incarceration, and the other parent is not present, the risk of forfeiting parental rights is necessarily great.

**¶33** In this decision, the Court has begun to reattach the standards for termination of parental rights to their essential due process moorings, in two significant and commendable ways. First, it tightens the factors that should be considered in terminating a child's relationship with an incarcerated parent, so that they are no longer "self-fulfilling" such that "incarcerated parents could never adequately maintain a parent-child relationship with their young children," an implication the Court correctly concludes is "contrary to law." *Supra* ¶ 17.

**¶34** Second, the Court makes clear that DCS must facilitate, and certainly may not affirmatively thwart, a parent's efforts to maintain a

relationship with his or her children while in custody.  *Supra* ¶¶ 18–21; *see Santosky,* 455 U.S. at 747–78; *Michael J.,* 196 Ariz. at 253 ¶ 38 (Zlaket, C.J., concurring in part and dissenting in part) (criticizing the predecessor agency to DCS for its failure to facilitate reunification).  I trust that in future cases, lower courts will require DCS to facilitate maintaining the parental relationship as it is constitutionally required to do, and that this Court will overturn termination orders where DCS fails to do so.

¶35          For the foregoing reasons, I concur with the substance and outcome of the Court's opinion.